975 A.2d 418 (2009)
200 N.J. 129
STATE of New Jersey, Plaintiff-Respondent,
v.
JosÉ NUÑEZ-VALDÉZ, Defendant-Appellant.
A-46 September Term 2008
Supreme Court of New Jersey.
Argued March 9, 2009.
Decided July 27, 2009.
As Corrected July 30, 2009.
*419 Justin T. Loughry, Moorestown, argued the cause for appellant (Loughry and Lindsay, attorneys).
Nancy P. Scharff, Assistant Prosecutor, argued the cause for respondent (Warren W. Faulk, Camden County Prosecutor, attorney; Ms. Scharff and Robert K. Uyehara, Jr., Assistant Prosecutors, on the letters in lieu of brief).
Jeffrey S. Mandel, Morristown, argued the cause for amici curiae Association of Criminal Defense Lawyers of New Jersey and American Civil Liberties Union of New Jersey (Pinilis Halpern and Edward L. Barocas, attorneys).
Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Anne Milgram, Attorney General, attorney).
Justice WALLACE, JR., delivered the opinion of the Court.
As part of a plea agreement, defendant José Nuñez-Valdéz pled guilty to fourth-degree criminal sexual contact in exchange for a State-recommended probationary sentence. The trial court accepted the plea and sentenced defendant consistent with the plea agreement. Based on his conviction, defendant was subsequently deported. Defendant filed a petition for post-conviction relief asserting that his counsel misinformed him that his plea would have no immigration consequences, and that if he had received accurate information about his rights and liabilities under immigration law, he would not have pled guilty. Following a plenary hearing, the trial court found that defendant's attorneys materially misinformed defendant concerning deportation, that defendant would not have pled guilty if he had received correct information, and that defendant demonstrated that his guilty plea was not made knowingly, voluntarily or intelligently. Consequently, the court ordered that defendant's plea be withdrawn and the matter proceed to trial.
The State appealed. The Appellate Division disagreed with the trial court's findings and reversed. We granted defendant's petition for certification and now reverse. We hold that there was sufficient credible evidence for the trial court to conclude that defendant was misinformed by counsel and that defendant would not have pled guilty if he had received accurate information that his plea would result in deportation.

*420 I.
We recite the procedural history and facts together. In June 1997, defendant was accused of second-degree attempted sexual assault of a seventeen-year-old girl and four counts of fourth-degree criminal sexual contact. In June 1998, he agreed to plead guilty to a one-count accusation charging fourth-degree criminal sexual contact in exchange for a recommended probationary sentence. Consistent with the plea agreement, the trial court imposed a five-year probationary sentence.
On September 27, 2000, the United States Immigration Court ordered that defendant be deported to his native Dominican Republic because of his conviction on the fourth-degree criminal sexual contact offense. Defendant appealed and the Board of Immigration affirmed the order in August 2002. Defendant was subsequently deported.
On October 11, 2002, defendant filed a petition for post-conviction relief (PCR). He alleged that his trial counsel misinformed him that there would be no immigration consequences arising from his guilty plea, and that he would not have pled guilty if his attorney had correctly informed him that his conviction would require deportation. Further, defendant claimed that the factual statement he offered at the time of his guilty plea did not support his conviction.
The PCR hearings began in June 2004. With the aid of a court-appointed interpreter, defendant testified that he was born in the Dominican Republic, came to the United States when he was 18 years old, does not speak or write English, is not a citizen of the United States, and lived in Camden with his wife and three children at the time of the offense. He stated, however, that at the time of his guilty plea he was a legal permanent resident.
Defendant recalled that in 1998 he was charged with sexual assault. With the help of his brother, Luis Nuñez-Valde~z, he hired Aaron Smith, Esquire, to represent him. Defendant asserted that Smith told him to plead guilty in exchange for a five-year probationary sentence, and that if he did not, he would receive a ten-year prison sentence. He stated that he asked Smith about his immigration consequences and Smith answered that "nothing like that" was ever going to happen.
Defendant said that at the plea hearing, Troy A. Archie, Esquire, appeared as his attorney instead of Smith. With the aid of an interpreter, defendant conferred with Archie, who indicated that if he did not plead guilty he would go to jail for ten years. Defendant stated that he raised the issue of his immigration status and that Archie said that it had "no part in this case." Defendant admitted that throughout the plea process he never specifically asked his attorneys about deportation, only about his immigration status. Defendant claimed that he would never have pled guilty if he had known it would result in his deportation.
On cross-examination the prosecutor questioned defendant concerning the plea form. Defendant claimed that neither Archie nor the interpreter reviewed the plea form with him, and that the interpreter told him to plead guilty without reading the papers to him. Defendant said that he was unaware that question seventeen on the plea form informed him that he may be deported as a result of his guilty plea. He maintained that he would not have pled guilty if he had been aware of question seventeen.
Defendant also asserted his innocence of the crime of criminal sexual contact because he did not use force and he did not touch the victim's private parts. He said his attorney told him to say he touched the *421 victim. Defendant further claimed that everything he said under oath at his plea hearing was false because his attorney "pressured [him] to do so."
Defendant's brother Luis testified that he hired Smith to represent defendant and that he acted as his brother's interpreter at the meeting with Smith because he speaks more English than defendant. Luis claimed that he asked Smith if there would be immigration or deportation problems because of this case and that Smith said that there would be none.
Archie testified on behalf of the State. Archie said that at the time of the plea, he had been practicing law for two years and that his practice was ninety percent criminal. Archie stated that, with the assistance of an interpreter, he read each line of the plea agreement to defendant, explained it to him, and asked if he had any questions. Based upon defendant's answers, Archie then circled the applicable responses on the plea form. He said he was "pretty sure" he talked about deportation, but he could not recall the substance of the conversation or whether defendant was concerned about it. He believed the subject came up in reviewing question seventeen on the plea form that asked defendant "[d]o you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" Archie recalled that he told defendant that deportation was a "possibility." He did not request a Spanish version of the plea form, although the Megan's Law form he used had a paragraph translated into Spanish. Archie admitted that he never told defendant that he would be deported if he pled guilty.
After hearing testimony and the arguments of counsel, the trial court rendered a comprehensive written opinion. The court summarized the testimony and assessed the credibility of each witness, accepting portions of that testimony and rejecting other portions. Although the court rejected much of defendant's testimony, it also considered defendant's lack of education, lack of sophistication, and modest level of intellect to find credible defendant's assertion that he raised the issue of his immigration status with both Smith and Archie and that deportation was a central concern when he pled guilty.
The court also expressed concerns about the reliability of the testimony of Luis. However, on the issue of Smith's purported advice to defendant regarding deportation, the court accepted Luis's testimony that Smith advised defendant that no immigration problems would result if defendant pled guilty. The trial court found that based on Smith's advice, it was reasonable for defendant to believe that he would not be deported as a result of pleading guilty.
In reviewing Archie's testimony, the court was very skeptical that he did not recall defendant being concerned about deportation. The court reasoned that it did not make sense that defendant, who had been in the United States for eighteen years with his wife and children, would not be concerned about deportation.
The trial court expressly found that "defendant was extremely concerned that his immigration status not be implicated" by his guilty plea, that the issue of immigration status was "material" to his decision to plead guilty, and that he expressed his immigration concerns to Smith and Archie. Additionally, the court found that Smith told defendant he would not be deported because the charges against him were not serious, and that Archie's statement that deportation was a "possibility" was inexact and inaccurate because it did not sufficiently convey the fact that deportation was a certainty under federal law. Based on those findings, the court concluded that *422 defendant was affirmatively misinformed by his attorneys as to the immigration consequences that would flow from a plea of guilty and that his guilty plea "was not made knowingly, voluntarily or intelligently." The court entered an order vacating the guilty plea and reinstating the charges.
After remanding the matter for reconstruction of the oral argument at the PCR hearing, the Appellate Division reversed in an unpublished opinion. The panel reviewed the record and concluded that the trial court's findings were clearly mistaken and that the interests of justice demanded intervention and correction. The panel listed five sources of concern with the trial court's factual findings. First, the panel noted "the lack of factual foundation" for the court's conclusion that defendant's primary concern was deportation and that he would not have pled guilty if properly informed on the subject. Second, the panel cited the court's selective and unexplained acceptance of certain testimony from defendant and his brother while finding other statements by the two to be totally incredible. Third, the panel took issue with the trial court's rejection of Archie's testimony that he told defendant that deportation could occur. Fourth, the panel disagreed with the court's implicit determination that Archie was unfamiliar with controlling immigration law and misinformed defendant. And finally, the panel stated that it could discern no reasonable basis for the court's determination that defendant regarded question seventeen on the plea form to be inapplicable to him, that he justifiably answered that question in a manner contrary to the truth, and that Archie's statements led him to do so. Consequently, the panel reversed the judgment of the trial court.
Defendant appealed and we granted certification. 196 N.J. 599, 960 A.2d 394 (2008). We granted amicus curiae status to the Attorney General of New Jersey and jointly to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the American Civil Liberties Union of New Jersey (ACLU).

II.
Defendant essentially contends that counsel materially misinformed him about the immigration consequences of his plea and that he would not have pled guilty if he had been correctly informed that his plea would result in deportation. Further, defendant argues that the Appellate Division erred in rejecting the trial court's findings based on that court's crediting of some, but not all, of his and other witnesses' testimony.
The State counters that the Appellate Division correctly overturned the trial court's grant of relief because deportation was not material to defendant's decision to plead guilty. The State argues that the Appellate Division properly rejected the trial court's factual findings because they were not based on credible evidence, but rather on the self-serving and contradictory testimony of defendant and his brother. Further, the State contends that counsel's advice exceeded the requirements for effective assistance of counsel because defendant was able to and did appeal the deportation order, which meant that deportation was not mandatory. Additionally, the State adds that because immigration status is only a collateral consequence of a conviction rather than a penal consequence, the lack of immigration advice was not a material problem with the plea and, thus, the plea should stand.
Amicus, the Attorney General, argues that this case presents the Court with the opportunity to address the "growing problem of how to ensure that a knowing guilty plea is entered by a non-citizen defendant." The Attorney General contends that based on our case law, whether deportation *423 is a penal or a collateral consequence is not the relevant issue, but instead we need to have procedures in place to ensure that non-citizen defendants are aware of the potential deportation consequences at the time of a guilty plea. The Attorney General suggests that the trial court should personally address defendants and inform them that deportation may result from their conviction. Finally, the Attorney General concludes that in this case, because "yes" was circled on the plea form in response to question seventeen, defendant was aware that he could be deported as a result of his guilty plea.
Amici ACDL and ACLU jointly urge that question seventeen on the plea form may be misleading in its use of the phrase "may be deported," especially in cases in which deportation is a certainty. They contend that, regardless of the collateral versus penal distinction, it is ineffective assistance for counsel to provide erroneous information concerning possible immigration ramifications or to engage in actual misrepresentations of the consequences of a guilty plea. They argue that justice and fairness require that counsel present defendant with deportation consequences prior to accepting a plea. Finally, they recommend that this Court amend the plea form to include additional questions that focus on (1) the federal law requirement of mandatory deportation for an "aggravated felony" and (2) the right of defendant to seek legal advice regarding their immigration status prior to entering a plea of guilty.

III.

A.
This case essentially presents a claim of ineffective assistance of counsel based on defendant's assertions that counsel provided misleading information on the consequences of a guilty plea. Defendant contends that his attorneys told him to accept the plea offer in exchange for a probationary sentence and that the plea would not affect his immigration status.
Preliminarily, we note our agreement with amici that the traditional dichotomy that turns on whether consequences of a plea are penal or collateral is not relevant to our decision here. In State v. Bellamy, 178 N.J. 127, 138-39, 835 A.2d 1231 (2003), we approved of Chief Justice Wilentz's observation that whether a defendant should be advised of "`certain consequences of a guilty plea should not depend on ill-defined and irrelevant characterizations of those consequences.'" Id. at 139, 835 A.2d 1231 (quoting State v. Heitzman, 107 N.J. 603, 606, 527 A.2d 439 (1987) (Wilentz, C.J., dissenting)). That observation applies here.
However, unlike Bellamy, where the plea form did not include a reference to the Sexually Violent Predator Act,[1]id. at 133, 835 A.2d 1231, the plea form that defendant signed included question seventeen, which is intended to alert a defendant that there may be deportation consequences as a result of a plea of guilty. Thus, we presently treat deportation similar to a penal consequence that requires notice to defendant. Nevertheless, the question remains whether counsel renders ineffective assistance if he or she provides false or misleading information concerning the deportation consequences of a plea of guilty.
Under New Jersey law, ineffective-assistance-of-counsel claims "are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." State v. *424 Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992). For a defendant to establish a case of ineffective assistance of counsel, the defendant must show that "[defense] counsel's performance was deficient," and that "there exists `a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 463-64, 609 A.2d 1280 (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)). We approved of that two-part test in State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987), in which we held that the federal standard for evaluating an ineffective-assistance-of-counsel claim approved in Strickland, supra, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, should apply in defining our state constitutional guarantee of effective assistance of counsel.
When a guilty plea is part of the equation, we have explained that "[t]o set aside a guilty plea based on ineffective assistance of counsel, a defendant must show that (i) counsel's assistance was not `within the range of competence demanded of attorneys in criminal cases'; and (ii) `that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial.'" State v. DiFrisco, 137 N.J. 434, 457, 645 A.2d 734 (1994) (citations omitted) (second alteration in original).

B.
We turn next to assess whether defendant met his burden of proving that he was deprived of his state constitutional right to effective assistance of counsel. We elect to decide this case under our state constitution because we recognize that a federal remedy may depend on whether deportation is a penal or collateral consequence. As noted above, our analysis does not depend on whether deportation is a penal consequence.[2] Rather, the issue is whether it is ineffective assistance of counsel for counsel to provide misleading, material information that results in an uninformed plea, and whether that occurred here.
To assess whether defendant's counsel performed deficiently and misinformed him of the deportation consequences of his plea, we first outline the immigration law in effect at the time defendant entered his plea in 1998. Congress passed two statutes in 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA), 8 U.S.C.A. § 1189, and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub.L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified in various sections of 8 U.S.C.A.), both of which expanded the offenses for which an immigrant could be removed from this country and eliminated the traditional judicial review of final removal orders. See Melinda Smith, Criminal Defense Attorneys and Noncitizen Clients: Understanding Immigrants, Basic Immigration Law & How Recent Changes in Those Laws May Affect Your Criminal Cases, 33 Akron L.Rev. 163, 193-94 (1999). Specifically, IIRIRA "made the classification of a legal permanent resident as an `aggravated felon' a complete bar to relief from deportation." Id. at 200; 8 U.S.C.A. § 1227(a)(2)(A)(iii). "Aggravated felony" is defined as "murder, *425 rape, or sexual abuse of a minor." 8 U.S.C.A. § 1101(a)(43)(A). Thus, the crime to which defendant pled guilty as part of the plea agreement, one count of fourth-degree criminal sexual contact with a seventeen-year-old girl, required mandatory deportation. See also Susan L. Pilcher, Justice Without a Blindfold: Criminal Proceedings and the Alien Defendant, 50 Ark. L.Rev. 269, 287-300 (1997) (describing voluntary departure as one of few remaining options for relief from deportation for defendants accused of "aggravated felonies").
In this case, although there were some factual disputes concerning the advice the attorneys gave defendant, it was not challenged that Smith, the attorney defendant retained, told defendant that there would be no immigration consequences. To be sure, the advice Archie gave defendant at the plea hearing was disputed. Viewed in favor of the State, Archie informed defendant that there was a "possibility" he would be deported, and Archie filled out the plea form with defendant and circled "yes" next to the question, "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" However, viewed in favor of defendant, Archie testified that he could not recall the substance of what he discussed with defendant, that defendant inquired about immigration consequences of his plea, and that Archie reiterated Smith's assurance that the plea would not affect his immigration status. Despite the trial court's criticism of defendant's credibility on certain factual assertions, the court believed defendant's testimony that immigration consequences were very important to him and that Smith and Archie told him that his immigration status would not be affected by a decision to plead guilty.
A reviewing court is required to affirm the findings of the trial court if they could reasonably have been reached on sufficient credible evidence in the record. We recently reinforced that principle, stating that "[a]n appellate court `should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" State v. Elders, 192 N.J. 224, 244, 927 A.2d 1250 (2007) (quoting State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964)). We emphasized that
[a]n appellate court should not disturb the trial court's findings merely because `it might have reached a different conclusion were it the trial tribunal' or because `the trial court decided all evidence or inference conflicts in favor of one side' in a close case. A trial court's findings should be disturbed only if they are so clearly mistaken `that the interests of justice demand intervention and correction.' In those circumstances solely should an appellate court `appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.'
[Ibid. (citations omitted).]
In the present case, the Appellate Division concluded that the trial court's findings were not supported by an adequate factual foundation. We disagree. Our review of the record satisfies us that based on the testimony of the witnesses, the trial court did not abuse its discretion in crediting defendant's account that he received misleading or false information about immigration consequences. Indeed, the trial court was not obliged to credit all of defendant's testimony and was "entitled to draw inferences from the evidence and make factual findings based on [its] `feel of the *426 case.'" Elders, supra, 192 N.J. at 245, 927 A.2d 1250.
That is precisely what the trial court did. The court accepted some of defendant's testimony and rejected other portions. Further, the trial court gave reasons for its disbelief of Archie's account that he told defendant that deportation was a possibility. The court reasoned that if Archie were as familiar with immigration law as he professed to have been at the time of the plea, then he would have outlined to defendant the deportation consequences in greater detail, i.e. that deportation was a virtual certainty. Additionally, it was not disputed that neither Smith nor Archie ever informed defendant that federal law mandated deportation for "any alien who is convicted of an aggravated felony," 8 U.S.C.A. § 1227(a)(2)(A)(iii), and that the crime to which defendant would plead guilty was an aggravated felony.
Applying the required deferential standard, we conclude that there was sufficient credible evidence in the record to support the trial court's findings. It was error for the panel to disregard those factual findings and to make new findings.
The second part of the test for ineffective assistance of counsel is whether "`there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial.'" DiFrisco, supra, 137 N.J. at 457, 645 A.2d 734 (quoting Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203, 210 (1985)) (alteration in original). This is known as the "prejudice prong."
The trial court found that "defendant was extremely concerned that his immigration status not be implicated if he followed the advice of his attorneys to plead guilty, and that his immigration status was a central consideration in his decision to accept or reject the plea agreement." The court concluded that
[b]ecause the immigration consequence resulting from pleading guilty to the charge against him was material to the defendant's decision, and because the defendant's attorneys misinformed him as to the immigration consequence of pleading guilty, and because the defendant reasonably relied on the misinformation provided by his attorneys in deciding to plead guilty, the defendant has met his burden and demonstrated by a preponderance of evidence that his. . . guilty plea was not made knowingly, voluntarily or intelligently.
In short, the trial court accepted defendant's testimony that he would not have pled guilty if he had known he would be deported, and found that defendant did not give a knowing, voluntary or intelligent plea. Based on the trial court's findings, which are amply supported by the record, defendant satisfied the prejudice prong of the ineffective-assistance-of-counsel analysis by showing that he would not have pled guilty but for the inaccurate information from counsel concerning the deportation consequences of his plea. Accordingly, we reverse the judgment of the Appellate Division and reinstate the trial court's order that directed withdrawal of defendant's plea and reinstatement of the matter for trial.[3]

IV.
Finally, we share the concern of all amici that our plea procedures should be modified *427 to help ensure that a non-citizen defendant receives information sufficient to make an informed decision regarding whether to plead guilty. We recently revised our plea form, effective October 8, 2008, to address the concern that it did not adequately advise non-citizen defendants about immigration consequences. At that time, we divided question seventeen into two parts to read as follows:
17a. Are you a citizen of the United States?
 [yes] [no]
If no, answer question # 17b
17b. Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?
We agree that further refinement of the plea form is needed. We approve of the suggestion of the ACDL and the ACLU that the plea form should inform a non-citizen defendant that "if your plea of guilty is to a crime considered an aggravated felony under federal law you will be subject to deportation/removal" and that the form should instruct defendants of their right to seek legal advice regarding their immigration status. Further, it is preferable that the trial court inquire directly of defendant regarding his knowledge of the deportation consequences of his plea.
We direct the Criminal Practice Committee and the Administrative Director to revise the plea form to include the above. We have attached a suggested amendment to the plea form as exhibit A.

VI.
The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for proceedings consistent with this opinion.
Justice RIVERA-SOTO, dissenting.
Reversing a judgment of the Appellate Division that bound defendant to a plea agreement he entered into more than a decade ago, the majority asserts that "there was sufficient credible evidence for the trial court to conclude that defendant was misinformed by counsel and that defendant would not have pled guilty if he had received accurate information that his plea would result in deportation." Ante at 131-32, 975 A.2d at 419-20. Because that conclusion is factually, legally and jurisprudentially unsound, I dissent.

I.
Between April and June 1997  over twelve years ago  defendant José Nuñez-Valdéz, then thirty-six years old, repeatedly sexually assaulted his neighbor, a seventeen-year-old girl. Defendant was arrested and charged with second-degree attempted sexual assault, in violation of N.J.S.A. 2C:5-1 and 2C:14-2(c), and fourth-degree criminal sexual contact, in violation of N.J.S.A. 2C:14-3(b) and 2C:14-2(c)(1). Defendant waived prosecution by indictment and, on June 10, 1998  over eleven years ago  defendant entered a guilty plea to an accusation charging him with fourth-degree criminal sexual contact, in violation of N.J.S.A. 2C:14-3(b).[4] Specifically, the accusation *428 charged that defendant committed  and defendant admitted under oath to committing  an act of criminal sexual contact "by intentionally touching the intimate parts of [his seventeen-year-old victim] either directly or through the clothing for the purpose of degrading or humiliating the victim or sexually arousing or gratifying [himself] through the use of force or coercion[.]" See also N.J.S.A. 2C:14-1(d) (defining "sexual contact").
As part of that plea hearing, defendant, with the assistance of his counsel, Troy A. Archie, Esq.,[5] and a court interpreter, completed a three-page plea form and, given the nature of the charge to which defendant pled, two supplemental "Megan's Law" forms, one of which was printed in both English and Spanish. See N.J.S.A. 2C:7-1 to -21 (providing for system of registration and community notification for sex offenders and offenders who commit other predatory acts against children). Question no. 17 of the plea form specifically asked: "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" Defendant circled "yes" as his answer. In response to question no. 23  "Are you satisfied with the advice you have received from your lawyer?"  defendant also circled "yes" as his answer. In response to the final question on the plea form  question no. 24: "Do you have any questions concerning this plea?"  defendant circled "no." Defendant signed each page of the plea form and presented it to the court.
During the plea hearing, Mr. Archie represented to the court that he "had an opportunity to go through the plea forms with [his] client" and that defendant has "initialed the first two and signed the last page, indicating the truthfulness of the information provided." (emphasis supplied). He noted that defendant "also signed the applicable waiver of indictment forms and the Megan's Law forms." Mr. Archie then "present[ed defendant] to the Court for questioning."
After defendant was placed under oath and the presence of an interpreter was noted on the record, the following colloquy occurred between the trial court and the defendant:
THE COURT: Mr. Nuñez, I understand that you're going to be pleading guilty, is that true?
DEFENDANT: Yes.
. . . .

*429 THE COURT: You have been represented in this matter by Troy Archie. Have you been fully satisfied with the legal advice he has provided?
DEFENDANT: Yes.
THE COURT: Are you currently under the influence of any medication?
DEFENDANT: No.
THE COURT: Are you pleading guilty voluntarily and of your own free will?
DEFENDANT: Yes.
THE COURT: All right. You have on the table in front of you a three-page plea form setting out the terms and conditions of the plea agreement. Is that your signature on the bottom of the third page?
DEFENDANT: Yes.
THE COURT: And are those your initials on the bottom of the other two pages?[6]
DEFENDANT: Yes.
THE COURT: At the time you signed the plea form, did you understand the questions?

DEFENDANT: Yes.

THE COURT: Were the answers that you gave there the truth?

DEFENDANT: Yes.

THE COURT: And you also have in front of you a supplemental plea form for certain sex offenses. Is that your signature on that document?
DEFENDANT: Yes.
. . . .
THE COURT: And at the time you signed it, did you understand that there are special conditions that apply to people who plead guilty to sex offenses?
DEFENDANT: Yes.
[(Emphasis supplied).]
Defendant's plea was accepted. On July 31, 1998, defendant was sentenced; the record reflects that he was represented by Juan J. Gonzalez, Esq., "covering today for Troy Archie, the attorney of record[,]" and that an interpreter was "interpreting for Mr. Nuñez." At the outset, Mr. Gonzalez noted that defendant was neither a United States citizen nor national; counsel pointed out that defendant was a citizen of the Dominican Republic and that he was a resident alien in the United States. Mr. Gonzalez asked that defendant be sentenced pursuant to the terms of his plea agreement, and defendant waived his right of allocution at sentencing. As provided in the plea agreement, defendant was sentenced to a term of five years probation, subject to the conditions that (1) defendant register as a Megan's Law offender, (2) defendant undergo a psychiatric evaluation and receive any prescribed treatment, (3) defendant have no contact with the victim, and (4) defendant pay certain applicable fines, penalties, assessments and fees. Defendant later was ordered to provide a blood sample for DNA analysis, as required by the DNA Database and Databank Act of 1994, as amended, N.J.S.A. 53:1-20.17 to -20.37. Defendant never appealed his conviction or sentence.[7]
On January 26, 2000, the United States Immigration and Naturalization Service (now known as Immigration and Customs Enforcement, or "ICE") commenced deportation proceedings against defendant based on his conviction. Those proceedings resulted in an order dated September 27, 2000 from the United States Immigration Court deporting defendant to his *430 country of origin, the Dominican Republic. That order was affirmed by the federal Board of Immigration Appeals on August 2, 2002.
Facing certain deportation, defendant was left with only one avenue of possible relief: to attack the cause of the deportation order, his conviction for fourth-degree criminal sexual contact. On October 11, 2002, defendant challenged his conviction by filing a petition for post-conviction relief (PCR). In it he claimed that his defense counsel had misled him as to the immigration consequences of his guilty plea and that he would not have pled guilty had he known that the plea would result in his deportation. Defendant also claimed that his guilty plea lacked a sufficient factual basis, a claim that is utterly without merit and is belied by the plain words on the pages of the transcript of defendant's guilty plea hearing.
Over a fourteen-month period, the PCR court conducted a four-day hearing on defendant's PCR petition. On June 14, 2004, the PCR court received defendant's testimony, which was consistent with the assertions made in his written PCR petition.[8] In respect of his conversations with Mr. Smith, the defense counsel he originally retained, but who never appeared in court on defendant's behalf, defendant, again through an interpreter, testified as follows:
Q. Did you discuss with Mr. Smith anything about your immigration status?
A. Yes, and he told me that nothing like that was ever going to happen.
Q. Well, did you ask him about this criminal case and what it might mean for you as an immigrant?
A. Yes, and he told me that nothing was going to happen to me.
Recounting his discussions with Mr. Archie, who represented defendant at the guilty plea hearing, defendant testified:
Q. Did you discuss with [Mr. Archie] anything about your immigration status?
A. Yes.
Q. And what did you talk about with that lawyer?
A. I asked him if immigration will play a part in this case if I pled guilty and he told me no, it would just be five years probation. That's it.
Defendant conceded that his change of heart had nothing to do with any assertion of innocence, but only with the collateral consequences of his plea:
Q. Okay. Now, going back to the time that you pled guilty. If you had known that the result of pleading guilty would be to be deported from the United States, if you had known that would be the result, would that have changed your decision to plead guilty?
A. Yes.
. . . .
Q. . . . . If you had known you would be deported, would you have wanted to go to trial instead?
A. Yes. I would not have pled guilty.
Changing his emphasis, defendant then cast blame on everyone save himself in respect of knowledge of the immigration consequences of his guilty plea:
Q. Now, let me ask you about the guilty plea for just a moment.

*431 Did anyone explain to you while you were in front of the judge that you would be deported if  because of the guilty plea? Did the judge tell you that?
A. No.
Q. Now, there was  do you remember filling out with your attorney a several page long form about your guilty plea?
A. No, I didn't. The attorney filled it out by himself. That's all.
. . . .
Q. [Showing defendant the executed plea form.] Do you see your name or initials on the bottom of the first page?
A. Yes. Yes.
Q. And on the second page?
A. Yes.
Q. And on the third page?
A. Yes.
Q. Did you sign that?
A. Yes.
Q. Now this form [indicating the executed plea form], is written in the English language. Is that right, Mr. Nuñez?
A. Yes.
Q. Are you able to read this form?
A. No.
Q. Do you remember whether your attorney or anybody else translated the form for you?
A. No. There was a woman speaking, but I was never told anything about that.
Q. What do you mean about that?
A. Like telling me that something was going to happen or that. No, no.
Q. You mean with immigration?
A. Correct, no.
Defendant's protestations of blame did not survive cross-examination when, being asked about his plea hearing and the execution of the plea form beforehand, he testified as follows:
Q. And [during the plea hearing] you had an interpreter in court translating for you again, right?
A. Yes.
Q. Was the interpreter who was in court the same person who is meeting with you and [Mr. Archie]?
A. Yes.
More to the point, defendant was forced to recognize his predicament: that, by his own admission, he had to be lying either during his sworn testimony at the plea hearing or during his testimony in the PCR hearing. Conveniently selecting the former and all the while consistently laying blame elsewhere, he testified that:
Q. Okay. So if I get this straight, everything that you said in court when you pled guilty was false?
A. Yes.
Q. And you recall you were under oath when you gave that testimony?
A. Yes.
Q. So you're admitting that you lied under oath when you were in court the day you pled guilty?
A. Yes, because the attorney pressured me to do so.
On July 1, 2005, the PCR court heard the testimony of defendant's brother, Luis Nuñez-Valdéz, who testified as to the two conversations in which he participated. First, he explained his version of the conversation with Mr. Smith concerning the retention of Mr. Smith as counsel for defendant, and the conversation with Mr. Gonzalez, defendant's sentencing counsel, that occurred immediately preceding the sentencing hearing. Defendant's brother admitted that he was not a party to the conversation among defendant, Mr. Archie (defendant's counsel at the plea hearing), and the interpreter during which the plea *432 form was completed. Tellingly, that was the only conversation during which defendant claimed he was told there would be no immigration consequences to the plea deal, and also when defendant now claims he was "pressured" to plead guilty.
On July 25, 2005, the PCR court heard Mr. Archie's testimony. Called as a witness by the State, Mr. Archie testified that he met with defendant immediately before the June 10, 1998 plea hearing in the company of a court-appointed interpreter. Identifying defendant's signature, the signature of the assistant prosecutor and his own signature on the plea form, Mr. Archie testified:
Q. Did you go over this form with Mr. Nuñez-Valdéz?
A. Yes, I did.
Q. Do you recall when it was you went over this form with him?
A. It would have been the date of the plea agreement, 6/10/98.
Q. Would that also be the date that you met Mr. Nuñez-Valdéz in court?
A. Yes.
Q. Okay. Now, in going over this form with Mr. Nuñez-Valdéz, how did you go over the form with him?
A. With the assistance of the interpreter, I read each line item, numbered item, and explained it to him and answered any questions he had.
Q. Okay. Now, the circled answers on there, who answered  who circled the answers on this plea form?
A. I circled the answers.
Q. Okay. And based on what did you circle these answers?
A. Based on the responses from Mr. Nuñez.
The State then focused on the plea form questions concerning possible deportation consequences of a guilty plea:
Q. I'm going to direct your attention specifically to Question Number 17.
Did you go over Question Number 17 with Mr. Nuñez-Valdéz?
A. Yes.
Q. And do you recall the nature of the conversation you had with Mr. Nuñez-Valdéz when you went over that with him?
A. I wouldn't be able to say the nature of the conversation word-for-word, but we talked about deportation.
Q. Okay. Did he  do you remember if he asked you anything about deportation or immigration?

A. I don't specifically remember him being concerned about deportation.

Q. With regard to Question 17, though, did you read Question 17 to him?
A. Yes.
Q. And the answer that's circled there, what was the basis for your circling that answer?
A. Based on his response that he understood the question.
[(Emphasis supplied).]
Putting the lie to defendant's assertion that his sole concern in respect of his guilty plea was his immigration status, Mr. Archie testified as follows:
Q. Okay. Now, when you went over this plea form with him in what appeared to be  rather, do you recall roughly what was the main gist of his concerns when you went over this with him?
A. The main gist of his concerns was incarceration.
Q. Okay. Do you recall if he asked you about deportation or immigration?
A. No, I do not.
Q. Did  now, when you say incarceration was the main gist of the conversation *433 with him, do you recall if he asked you anything in particular about incarceration?
A. I just remember he was concerned about whether or not he was going to jail.
Q. Did he ask you that during this going over the plea form with him?
A. Yes.
Q. Did he ask you that more than once?
A. Not only did he ask me, but the family members [who] were there with him.
On cross-examination, Mr. Archie explained that he had studied immigration law in law school and that, as of the date of defendant's plea, he was well aware of the federal statutory provisions that trigger deportation when a particular species of felony has been committed. Addressing that topic squarely, Mr. Archie testified as follows:
Q. Now, what you haven't told us, Mr. Archie, is what did you tell Mr. Nuñez, if you can remember, about immigration and this case?
A. I'm pretty sure we talked about deportation based on the question that's on there.
Q. But what I'm asking you, sir, is what did you tell him?
A. Word-for-word, I can't remember exactly what I told him.
Q. But you're pretty sure that you spoke about deportation.
A. Absolutely.
Q. And you don't remember what it is you said, correct?
A. No.
Q. But doing the best you can sitting here today, best you can tell us is that the topic of immigration and deportation was a part of your discussion, right?
A. Yes.
Turning to defendant's primary focus  whether he would be incarcerated  Mr. Archie testified that:
Q. Well, you said that incarceration was of concern to Mr. Nuñez. Is that right?
A. Yes.
Q. You don't remember whether Community Supervision for Life was a concern to him? You don't remember one way or the other?
A. No. What I do remember is as long as he wasn't going to jail, he was satisfied.
On redirect examination, Mr. Archie returned to the question of whether defendant had been advised of the immigration consequences of his guilty plea:
Q. Now, do you recall on deportation what advice, if any, you gave him?
A. I told him it's a possibility that he would be deported.
Q. Okay. Do you recall why you may have told him that?
A. Well, basically, it's on the form, one, and it's a sexual assault case, so there's a chance that you will be deported. It doesn't mean that you are guaranteed to be deported.
On recross-examination, that point was explored even further:
Q. And in terms of telling Mr. Nuñez, you tell us today, that possibly he could be deported, do you remember the exact words that you used?
A. There's a possibility that you may be deported.
Q. Now, when I was asking you questions 10 minutes ago, you didn't remember what words you used, but now you're telling us that you told him it was a possibility he would be deported?

*434 A. I can't tell you that's word-for-word, but I know that's the general conversation.
Q. Do you remember him raising any questions about what you meant by that?
A. I remember his main concern was whether or not he was going to jail.
Q. But my question is did he say to you what do you mean a possibility? Strong possibility? Weak possibility? Possible possibility? Do you remember him saying anything or don't you?
A. No, I don't remember him going into that.
Q. And, so, you didn't define it any further, correct? Am I right?
A. Not that I can recall.
The PCR court then heard argument on August 1, 2005[9] and, on November 7, 2005, it issued its decision granting defendant's petition. Crediting, in part, defendant's testimony, the PCR court noted that, "given the defendant's naivet[é], this court finds that when the defendant expressed concern to his attorneys about immigration problems, he was actually expressing concern about what might happen to him as a result of pleading guilty  including being deported  as a result of his resident alien status." It stated that it was "not at all impressed with the defendant's credibility given the totality of his testimony." That said, the PCR court nevertheless found that "the defendant did express concerns about his legal status in this country as a result of pleading guilty and that his concern in this regard was expressed to both Attorney Smith and Attorney Archie."
The PCR court incorrectly couched the issue before it, asserting that "[b]ecause the issue of his immigration status was material to the defendant's decision to plead guilty, the outcome of this case turns on whether Attorneys Smith and Archie misinformed the defendant." It reasoned that "[w]hen a defendant fails to raise immigration as an issue with his attorney in conjunction with a plea bargain, the defendant's attorney has no independent obligation to raise the issue of immigration to his client because, in that situation, immigration is a collateral matter." (citations omitted). It articulated that, in contrast, "[i]mmigration was not a collateral issue for this defendant; it was a central consideration in his decision to accept or reject the plea agreement." In the PCR court's view, "defendant believed that his immigration status would not be affected no matter how he responded on the plea form." It concluded as follows:
Because the immigration consequence resulting from pleading guilty to the charge against him was material to the defendant's decision, and because the defendant's attorneys misinformed him as to the immigration consequence of pleading guilty, and because the defendant reasonably relied on the misinformation provided by his attorneys in deciding to plead guilty, the defendant has met his burden and demonstrated by a preponderance of the evidence that his [June 10, 1998] guilty plea was not made knowingly, voluntarily or intelligently.
It therefore ordered that defendant's guilty plea be vacated and the original warrant against him be reinstated.[10]
*435 The State appealed, and the Appellate Division reversed. Rejecting the PCR court's findings as "`so wide of the mark[that] a mistake must have been made[,]'" (quoting State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964)), the panel explained that
[its] concern with the PCR judge's findings stems from (1) the lack of factual foundation for the judge's conclusion that defendant's primary concern was deportation and thus his unquestioned acceptance of the assertion that defendant would not have pled guilty if properly informed on the subject; (2) his selective and unexplained acceptance of testimony by defendant and his brother regarding their allegedly futile inquiries into the possibility of deportation, while declaring the remainder of the testimony by the two witnesses to be "totally incredible" and unreliable; (3) his rejection of testimony by Archie, while otherwise "highly regarded," that he recalled discussing the subject of deportation with defendant and informing him of the possibility that such could occur; (4) his implicit determination that Archie was unfamiliar with controlling immigration law and misinformed defendant; and (5) the lack of any foundation for the conclusion that defendant's affirmative response to question seventeen was of no import.
The Appellate Division could "find nothing in the record that would counteract Archie's testimony that defendant's concerns were primarily focused on whether he would serve a custodial sentence." With reluctance, it reasoned that it "cannot accord the same weight as the judge did to defendant's statement that he would not have pled guilty if accurately informed of the likelihood of deportation."
Rightly discarding a number of the PCR court's findings as lacking proper foundation in the record, the Appellate Division addressed the PCR court's credibility determinations as follows:
An acceptance of the judge's overall credibility determinations leads us to conclude that Archie, not defendant or his brother, was the more credible witness. The accuracy of that conclusion is borne out by a close reading of Archie's testimony, which discloses Archie's careful delineation of those facts that he recalled from defendant's case, which he stated in some detail, and those that he did not. While it is true that seven years had intervened between Archie's representation of defendant at the plea hearing and his testimony, Archie's description of what took place stood unimpeached by testimony the PCR judge viewed as credible. In that regard, Archie testified that, with *436 the aid of an interpreter, he discussed question seventeen and its implications with defendant. To be sure, Archie did not state that deportation was the certainty that the PCR judge posited. Nonetheless, we do not find therein the misstatements that the PCR judge perceived to exist, particularly in the absence of any evidence that deportation inevitably occurs upon conviction of a statutorily enumerated aggravated felony or evidence of a uniform lack of success in appealing from an order of deportation.
For those reasons, the panel concluded that "contrary to the PCR judge's conclusion, we find that defendant failed to offer competent proof that he was misinformed of the consequences of his plea, State v. Nichols, 71 N.J. 358, 361, 365 A.2d 467 (1976), and thus that the plea was not given voluntarily, knowingly, and intelligently. State v. Taylor, 80 N.J. 353, 362, 403 A.2d 889 (1979); R. 3:9-2." It thus ruled that, "[a]s a result, we do not find the manifest injustice to exist that defendant must demonstrate in order to vacate his plea, following sentencing. Taylor, supra, 80 N.J. at 362, 403 A.2d 889; R. 3:21-1."
This appeal followed.

II.
According to the majority, "[t]his case essentially presents a claim of ineffective assistance of counsel based on defendant's assertions that counsel provided misleading information on the consequences of a guilty plea." Ante at 137-38, 975 A.2d at 436. In the majority's view, State v. Bellamy, 178 N.J. 127, 835 A.2d 1231 (2003), provides the rule for decision. In Bellamy, the Court reaffirmed that, "[t]raditionally, the determination of whether defendant must be informed of certain consequences of his plea turns on whether those consequences are `direct or penal,' in which case defendant must be informed, or `collateral,' in which case defendant need not be informed." Id. at 137, 835 A.2d 1231 (quoting State v. Heitzman, 209 N.J.Super. 617, 622, 508 A.2d 1161 (App. Div.1986), aff'd o.b., 107 N.J. 603, 527 A.2d 439 (1987)). However, after citing to that time-honored principle, Bellamy discarded it, claiming that "`[i]t matters little if the consequences are called indirect or collateral when in fact their impact is devastating.'" Id. at 138, 835 A.2d 1231 (quoting Heitzman, supra, 107 N.J. at 606, 527 A.2d 439 (Wilentz, C.J., dissenting)).
Bellamy addressed a distinction without a difference. At issue in that case was whether a defendant pleading guilty to a qualifying offense should be informed of the potential for a later civil commitment under the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. Id. at 131, 835 A.2d 1231. In that unique context, the Court adopted a hybrid approach: without declaring that the SVPA's effect was either, on the one hand, "direct" or "penal," or, on the other, "collateral," the Court held that "fundamental fairness requires that prior to accepting a plea to a predicate offense, the trial court must inform a defendant of the possible consequences under the [SVPA]." Ibid. Thus, Bellamy's "fundamental fairness" exception, by its own terms, is limited to those instances when the same sovereign imposes consequences arising from a guilty plea that "may be so severe that a defendant may be confined for the remainder of his or her life[.]" Id. at 139, 835 A.2d 1231. That said, Bellamy nevertheless "continue[d] to stress the necessity of determining whether a consequence is direct or penal when analyzing whether a defendant must be informed of a particular consequence." Ibid.
*437 That bedrock concept  that the benchmark for whether a defendant must be informed of consequences before pleading guilty remains as whether the consequence is "direct" or "penal"  was reaffirmed within two years of Bellamy. In State v. Johnson, 182 N.J. 232, 236, 864 A.2d 400 (2005), this Court again made clear that, "[a]lthough a court is not responsible for informing a defendant of all consequences flowing from a guilty plea, at a minimum the court must ensure that the defendant is made fully aware of those consequences that are `direct' or `penal.'" (quoting State v. Howard, 110 N.J. 113, 122, 539 A.2d 1203 (1988)). We explained that
[t]he requirement that the court be satisfied in that respect serves several salutary ends. It avoids having a defendant enter into a plea hampered by being "misinformed . . . as to a material element of a plea negotiation, which [he] has relied [on] in entering his plea." State v. Nichols, 71 N.J. 358, 361, 365 A.2d 467 (1976). As a collateral matter, the entire criminal justice system's interest in finality is advanced. Clarity as to the direct and penal consequences of a defendant's guilty plea promotes the binding resolution of charges because it serves to ensure that a defendant's "expectations [are] reasonably grounded in the terms of the plea bargain." State v. Marzolf, 79 N.J. 167, 183, 398 A.2d 849 (1979).
[Id. at 236-37, 864 A.2d 400.]
In that context, it cannot be said that immigration consequences are "direct" or "penal" so as to justify the vacation of defendant's guilty plea. The majority tacitly concedes that precise point when it "elect[s] to decide this case under our state constitution because we recognize that a federal remedy may depend on whether deportation is a penal or collateral consequence." Ante at 139, 975 A.2d at 424. Traditional analysis requires that a consequence be deemed "direct" or "penal" before its materiality can ever be considered to impeach a guilty plea. That analysis would demand the conclusion that defendant's belated claim is immaterial to his guilty plea. For that reason, the majority is forced to seek another, different avenue of relief: the claimed ineffective assistance of counsel based on the provision of alleged misinformation.

III.
Acknowledging that, under a traditional rubric defendant would be barred from relief, the majority shifts gears and announces instead that its "analysis does not depend on whether deportation is a penal consequence." Ante at 139, 975 A.2d at 424. At bottom, the majority sidesteps "the distinction between collateral consequences and penal consequences." Ante at 139, 975 A.2d at 424 n. 2. According to the majority, "[r]ather, the issue is whether it is ineffective assistance of counsel for counsel to provide misleading, material information that results in an uninformed plea, and whether that occurred here." Ante at 139-40, 975 A.2d at 424. The majority recognizes that "[f]or a defendant to establish a case of ineffective assistance of counsel, the defendant must show [(1)] that defense counsel's performance was deficient, and [(2)] that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Ante at 138-39, 975 A.2d at 423-24 (citations, internal quotation marks, and editing marks omitted). That test is often referred to as the Strickland/Fritz test for ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984); State v. Fritz, 105 N.J. 42, 58, *438 519 A.2d 336 (1987). It is to an application of that test that one must now turn.
Applying the first prong of the Strickland/Fritz analysis, the majority focuses on whether counsel's performance was deficient. See State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992). To define the level of proficiency required, the majority then detours through federal immigration law ultimately to conclude that the advice defendant claimed he was given  a claim roundly contradicted by at least one of the lawyers defendant claimed gave it to him  was wrong.[11] Ignoring common sense, the majority exalts defendant's testimony above that of all others solely because "[a] reviewing court is required to affirm the findings of the trial court if they could reasonably have been reached on sufficient credible evidence in the record[,]" ante at 141-42, 975 A.2d at 425-26, and thus concludes that "the [PCR] court did not abuse its discretion in crediting defendant's account that he received misleading or false information about immigration consequences." Ante at 141-42, 975 A.2d at 425-26. Because the majority further reasons that "there was sufficient credible evidence in the record to support the trial court's findings[,]" it perforce concludes that "[i]t was error for the panel to disregard those factual findings and to make new findings." Ante at 142-43, 975 A.2d at 426.
That is far from enough. As the majority readily notes, there is a second prong to the Strickland/Fritz test, that is, the "prejudice prong." Ante at 142, 975 A.2d at 426. In the majority's view, defendant satisfied this part of the test simply by asserting that "he would not have pled guilty but for the inaccurate information from counsel concerning the deportation consequences of his plea." Ante at 143, 975 A.2d at 426. Prejudice cannot be so easily demonstrated.
In the majority's view, the simple assertion that "I-was-misled-and-I-would-not-have-pled-guilty-if-I-had-been-told-of-a-consequence-of-my-plea-that-is-neither-direct-nor-penal" suffices to satisfy both prongs of the Strickland/Fritz analysis. If so, then that test lacks substance or meaning. We have explained "`[t]he first prong of the test is satisfied by a showing that counsel's acts or omissions fell outside the wide range of professionally competent assistance considered in light of all the circumstances of the case.'" State v. Allegro, 193 N.J. 352, 366, 939 A.2d 754 (2008) (quoting State v. Castagna, 187 N.J. 293, 314, 901 A.2d 363 (2006)). We also have stated that Strickland/Fritz's "second prong is satisfied by a defendant's showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 367, 939 A.2d 754 (citations and internal quotation marks omitted). We have emphasized that Strickland/Fritz's "second prong  that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different  is an exacting standard: the error *439 committed must be so serious as to undermine the court's confidence in the jury's verdict or the result reached." Ibid. (citations, internal quotation marks, and editing marks omitted).
Gauged against that standard, it is disingenuous to credit in the least defendant's self-serving recantation of his guilty plea. It is child's play to acknowledge that defendant, in a last ditch effort to avoid the consequences of his own actions, needed to claim that his lawyers told him there would be no immigration consequences to his plea. As defendant now reasons, facing certain deportation, what other choice, shy of impugning his lawyers, the interpreters and the court, did he have? Yet, we need not fall prey to such maneuverings. In measuring defendant's credibility, one must take into account  which neither the PCR court nor the majority does  that this defendant has placed himself in the position where he must pick his poison: he must assert either that he perjured himself at the guilty plea hearing, or that he perjured himself at the PCR hearing. Neither result bodes well for his credibility.
In contrast, Mr. Archie  who the PCR court described as a lawyer who "has appeared before this court on numerous occasions and is held in high regard by this court as a person and for his work as a lawyer"  testified without qualification that he was aware of the immigration consequences of a guilty plea; that, in those now bygone pre-9/11 days, he "absolutely" discussed immigration consequences with defendant; and that he advised defendant that there was "a possibility that he would be deported." More importantly, Mr. Archie testified unequivocally that "[t]he main gist of [defendant's] concerns was incarceration[;]" that what "he was concerned about [was] whether or not he was going to jail[;]" and that defendant did not raise any deportation concerns. In the battle of credibility, Mr. Archie  who truly has no interest in the outcome of defendant's PCR application  wins unquestionably. Defendant has failed woefully to demonstrate either that his counsel's performance was deficient or that such deficient performance caused defendant prejudice.
Aided by the clarity of hindsight, the relevant facts emerge without distortion. Defendant, with the assistance of his lawyer and an interpreter, reviewed the plea form and unequivocally confirmed his understanding that if he was not a United States citizen or national, he might be deported by virtue of his plea of guilty. Before the court, defendant, again aided by his counsel and an interpreter, testified under oath that he was pleading guilty because he was guilty, that he had reviewed the plea form and had signed it of his own free will, and that he was satisfied with his counsel's performance. At sentencing, defendant, once more with his lawyer's and an interpreter's assistance, was present when his lawyer spread upon the record that defendant was neither a United States citizen nor national, but a resident alien from the Dominican Republic. It was only after he was ordered deported  more than four years after he already had accepted without protest or objection the terms of his plea  that defendant belatedly claims his plea was neither voluntary, nor knowing, nor intelligent. Just as his claim that his plea lacked foundation because he did not use force on his victim is belied by the plea transcript  where defendant plainly states that, yes indeed, he did use force in the sexual assault on his victim  so too defendant's claim that he was misinformed of the immigration consequences of his plea is belied by the plea form and the testimony of Mr. Archie.

*440 IV.
There is a separate, independent reason this Court should stay its hand. Shortly after argument in this matter, amicus the Attorney General of New Jersey brought "to the Court's attention the recent grant of certiorari by the United States Supreme Court in Kentucky v. Padilla, 253 S.W.3d 482 (Ky.2008), cert. granted, ___ U.S. ___ [, 129 S.Ct. 1317, 173 L.Ed.2d 582] (Feb. 23, 2009)." That case raises the precise issue presented here: "If a criminal defense attorney falsely advises a non-citizen client that his plea of guilty will not result in deportation, can that misadvice constitute ineffective assistance of counsel under the Sixth Amendment?" Brief of Petitioner, at i. In that case, "[p]etitioner Jose Padilla, a longtime lawful permanent resident of the United States and U.S. Army veteran, pleaded guilty in 2002 to a state felony offense for marijuana drug trafficking." Id. at 2. Padilla asserted that he pled guilty "on the advice of defense counsel that he did not need to worry about deportation because he had been in this country for so long." Ibid. He complained that, "[i]n fact, the Kentucky drug trafficking offense is an `aggravated felony' under federal law that effectively subjects Padilla to mandatory deportation." Id. at 2-3. He explained that "[t]he Kentucky Supreme Court nonetheless denied Padilla's motion to vacate his plea on the grounds of ineffective assistance of counsel[, holding] that advice on the `collateral consequence' of deportation is outside the scope of the Sixth Amendment guarantee, and that neither failure to advise nor even affirmative misadvice about such consequences can give rise to a claim of ineffective assistance of counsel." Id. at 3. He argues that "[t]he Kentucky rule has no basis in precedent or logic, and this Court should reject it." Ibid.
With considerable understatement, amicus the Attorney General notes that "[t]he issues raised in Padilla are similar to those raised by the defendant in this case, and the United States Supreme Court decision in Padilla may be relevant to the disposition in this matter." In point of fact, the issues in Padilla are identical to those in this case. Furthermore, our standard for the ineffective assistance of counsel draws its genesis from and is identical to federal precedent, see Fritz, supra, 105 N.J. at 58, 519 A.2d 336 (adopting federal Strickland standard under state constitution and holding that "under Article I, paragraph 10 of the State Constitution a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated"). That conclusion has been reaffirmed time and time again, as even a small handful of our precedents conclusively shows. See State v. Echols, 199 N.J. 344, 357-58, 972 A.2d 1091 (2009) (stating that, in Fritz, "we addressed a criminal defendant's constitutional right to the assistance of `reasonably competent counsel' and adopted the standards for evaluating ineffective assistance of counsel claims established by the United States Supreme Court in Strickland"); State v. Loftin, 191 N.J. 172, 197, 922 A.2d 1210 (2007) ("In determining whether any deficiencies in trial or appellate counsel's representation have undermined a defendant's constitutional right to counsel, we have generally relied on the standards enunciated in Strickland[.]"); State v. DiFrisco, 174 N.J. 195, 219, 804 A.2d 507 (2002) (stating that "[t]his Court adopted the Strickland formulation in [Fritz]"); State v. Bey, 161 N.J. 233, 251, 736 A.2d 469 (1999) (stating that "[t]he test for measuring the effectiveness of counsel *441 ... is set forth in the opinions of the Supreme Court of the United States in Strickland ... and of this Court in [Fritz]"); State v. Chew, 150 N.J. 30, 76, 695 A.2d 1301 (1997) (stating that "[i]n Fritz, we adopted the two-part test set forth in Strickland").
When, as here, we are confronted with an issue presently pending before the highest court of this land and where our jurisprudence draws its origins from and parallels that of the Supreme Court of the United States, judicial restraint of thought and prudence in action dictate that we stay our hand and await until that Court speaks. Thenonce we are better informedand only then should we act.

V.
There is something terribly amiss in upending an otherwise valid conviction concerning events that occurred over twelve years ago, resulting in a conviction and sentence imposed more than eleven years ago, later resulting in a deportation that occurred over five years ago, all in favor of one whose contempt for the legal processes he invokes is self-evident in his cavalier familiarity with the truth, his ready admission of perjury, and his failed attempts to reenter the country illegally, resulting in yet another detention. Furthermore, in the circumstances presented, there simply is no credible evidence supporting defendant's claims. Thus, the PCR court's judgment was flawed and should not be sustained. Similarly, the majority's acceptance of that flawed judgment leads to an equally wrong result. Because the facts and the applicable law, as the Appellate Division aptly found, more than amply justify denying defendant relief, I dissent.[12]
For reversal and remandmentChief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS6.
For affirmanceJustice RIVERA-SOTO1.
NOTES
[1] N.J.S.A. §§ 30:4-27.24 to -27.38.
[2] We note that the Attorney General of New Jersey submitted a letter brief bringing to this Court's attention a related case presently before the Supreme Court of the United States, Kentucky v. Padilla, 253 S.W.3d 482 (Ky. 2008), cert. granted, ___ U.S. ___, 129 S.Ct. 1317, 173 L.Ed.2d 582 (Feb. 23, 2009). In part, the issue before the Supreme Court involves the distinction between collateral consequences and penal consequences. Our opinion does not rely on that distinction, so we need not await the outcome in Padilla.
[3] The trial court only listed complaint W-1997-6740-0408 as reinstated. However, because defendant was also initially charged under complaint W-1997-6739-0408, which was dismissed at sentencing pursuant to the plea agreement, both complaints should be reinstated.
[4] The relevant portion of the criminal sexual contact statute provides that "[a]n actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2c. (1) through (4)[,]" N.J.S.A. 2C:14-3(b). The accusation contains handwritten interlineations to the effect that defendant also was charged with violating N.J.S.A. 2C:14-2(c)(1), a statute that prohibits sexual assaults. That statute provides that "[a]n actor is guilty of sexual assault if he commits an act of sexual penetration with another person [and] uses physical force or coercion, but the victim does not sustain severe physical injury[.]" Ibid. Further, the term "sexual penetration" is statutorily defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction. The depth of insertion shall not be relevant as to the question of commission of the crime[.]" N.J.S.A. 2C:14-1(c). Defendant's judgment of conviction also shows that defendant pled guilty to fourth-degree criminal sexual contact, in violation of N.J.S.A. "2C:14-3(b)/14-2c(1)[.]" Yet, sexual assault in violation of N.J.S.A. 2C:14-2(c)(1) is a crime of the second degree, and not a fourth-degree crime, and the plea colloquy supports the criminal sexual contact charge, and not the more serious sexual assault charge. The record does not explain, and defendant does not complain about, this discrepancy.
[5] Defendant originally retained Aaron M. Smith, Esq. as his counsel. Mr. Smith never appeared in court on defendant's behalf and later was disbarred by consent. In re Smith, 170 N.J. 626, 790 A.2d 900 (2002). Defendant was represented at the plea hearing by Troy A. Archie, Esq.  Mr. Smith's then law partner  and at the sentencing hearing by Juan J. Gonzalez, Esq., who was variously identified either as someone who rented space in the same suite of offices as Mr. Smith or as Mr. Archie's associate (the Smith & Archie law partnership having been disbanded by then).
[6] In fact, defendant signed each page of the plea form, including the spots which called only for his initials.
[7] A hand-written insert on the plea form provides that defendant "waives [the] right to appeal[.]"
[8] Immediately preceding argument in this appeal, defendant's present counsel advised that defendant had been deported in 2004  apparently some time after he testified at the PCR hearing  and that, as a result of defendant's most recent attempt to re-enter the country illegally, "he is now in custody, recently detained by federal authorities at a border entry point."
[9] The transcript of the August 1, 2005 argument was inexplicably lost. That day's proceedings were ordered reconstructed, as directed by a March 30, 2007 order from the Appellate Division, and a reconstruction hearing was held on May 25, 2007. The parties consented to the record reconstruction proposed by the PCR court in a letter dated May 11, 2007.
[10] As the majority correctly notes, ante at 143, 975 A.2d at 426 n. 3, the PCR court mistakenly reinstated only the warrant that charged defendant with three counts of fourth-degree criminal sexual contact, in violation of N.J.S.A. 2C:14-3(b), which then gave rise to the single-count accusation to which defendant pled. Defendant also had been charged, in a separate warrant, with one count of second-degree attempted sexual assault, in violation of N.J.S.A. 2C:5-1 and 2C:14-2(c), and fourth-degree criminal sexual contact, in violation of N.J.S.A. 2C:14-3(b). The charges in the second warrant were dismissed as part of defendant's plea agreement. Thus, even if defendant is permitted to withdraw his plea, the plea agreement on which it is based is nullified in full and all charges  including the dismissed charges  must be reinstated. See State v. Williams, 39 N.J. 471, 480-81, 189 A.2d 193, cert. denied, 374 U.S. 855, 83 S.Ct. 1924, 10 L.Ed.2d 1075 (1963) (holding that "[f]air dealing to society requires that once [a defendant] has been permitted to withdraw his plea, he should be placed in the same position with respect to the [dismissed charges] as he was before the plea was entered"); State v. Nichols, 71 N.J. 358, 361, 365 A.2d 467 (1976); State v. Rhein, 117 N.J.Super. 112, 118, 283 A.2d 759 (App. Div.1971).
[11] Although I am unwilling to enter the briar patch that is federal immigration law, suffice it to note that, unlike the majority's categorical conclusion that counsel's advice in respect of the immigration consequences of defendant's plea was deficient, whether a state sexual offense constitutes an "aggravated felony" requiring deportation as a matter of course is, to say the least, an open question. See Singh v. Ashcroft, 383 F.3d 144 (3d Cir. 2004) (applying "formal categorical approach" of Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) in determining whether state law crime satisfies federal immigration definition of "aggravated felony"). See also Nijhawan v. Holder, 557 U.S. ___, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) (discussing categorization of crimes under "aggravated felony" statute).
[12] The majority also adopts additions to question no. 17 on the plea form. Those additions are, to me, unnecessary. Simply alerting a defendant who is contemplating a guilty plea that there may be immigration consequences to a convictionsomething that, ironically, is not done at all when a defendant chooses to go to trial and is convictedsuffices to place a defendant on notice. Piling on more and more to an already burdened form is a poor substitute for increased understanding.