**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4507-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

THOMAS DORSETT,

    Defendant-Appellant.

_____

> Argued May 3, 2021 – Decided August 2, 2021
>
> Before Judges Sabatino and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 11-01-0207.
>
> John P. Pieroni argued the cause for appellant.
>
> Mary R. Juliano, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Mary R. Juliano, of counsel and on the brief).

PER CURIAM

Defendant Thomas Dorsett appeals from the January 28, 2019 order of the Law Division denying his petition for post-conviction relief (PCR) without an evidentiary hearing and his application to withdraw his guilty plea to first-degree murder and first-degree arson for hire. We affirm.

I.

The following facts are derived from the record. In 2010, defendant conspired with his daughter, codefendant Kathleen Dorsett, to kill her ex-husband, with whom she was engaged in a custody dispute involving their young daughter. Defendant and Kathleen[1] agreed that when the ex-husband transferred custody of the child to Kathleen at her home, she would convince him on a pretext to go behind the garage, where defendant would be waiting to kill him. After the murder, defendant and Kathleen put the victim's body in the trunk of a car, which defendant abandoned in a restaurant parking lot. Defendant conspired with codefendant Anthony Morris to pay him to set fire to the car to destroy the victim's body.

Defendant and Kathleen were arrested on murder and other charges. Defendant retained private counsel to represent him. Initially, defendant

---

[1] Because defendant and two of his codefendants share a last name, we refer to them by their first names. No disrespect is intended.

A-4507-18

discussed with his counsel the possibility of mounting a passion/provocation defense to reduce his murder charge to a manslaughter conviction. Passion/provocation manslaughter is a "homicide which would otherwise be murder . . . [that] is committed in the heat of passion resulting from a reasonable provocation." State v. Mauricio, 117 N.J. 402, 411 (1990) (quoting N.J.S.A. 2C:11-4(b)(2)). Under this approach, defendant would argue that he fatally struck the victim after being provoked by him during an argument and Kathleen was not in involved in the death. According to an October 9, 2013 letter from defendant's counsel to defendant memorializing their pretrial strategy, the defense, if successful, would expose defendant to a shorter potential sentence and exonerate Kathleen.

However, Kathleen subsequently conspired from jail with her mother, codefendant Lesley Dorsett, to hire a hitman to kill the victim's mother. Unbeknownst to Kathleen and Lesley, the hitman was an undercover police officer and some of their conversations with him were recorded. After Lesley made a cash payment to the officer she too was arrested.

On January 31, 2011, a grand jury indicted defendant, charging him with: (1) first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a); (2) first-degree murder, N.J.S.A. 2C:11-3(a); (3) three counts of fourth-degree

3

tampering with physical evidence, N.J.S.A. 2C:28-6(1); (4) second-degree conspiracy to commit aggravated arson, N.J.S.A. 2C:5-2 and 2C:17-1(a)(2); (5) first-degree arson for hire, N.J.S.A. 2C:17-1(d); (6) second-degree conspiracy to commit desecration of human remains, N.J.S.A. 2C:5-2 and 2C:22-1(a); (7) second-degree desecration of human remains, N.J.S.A. 2C:22-1(a); (8) third-degree witness tampering, N.J.S.A. 2C:28-5(a); (9) third-degree conspiracy to commit financial facilitation, N.J.S.A. 2C:5-2 and 2C:21-25(e)(3); and (10) third-degree financial facilitation, N.J.S.A. 21:25(e)(3). The financial counts relate to bank transactions uncovered during the murder investigation.

The grand jury also indicted Kathleen charging her with the same offenses lodged against defendant, except for first-degree conspiracy to commit aggravated arson, first-degree arson for hire, and third-degree witness tampering. She was also charged with first-degree conspiracy to commit murder (her former mother-in-law), N.J.S.A. 2C:5-2 and 2C:11-3, and first-degree attempted murder (her former mother-in-law), N.J.S.A. 2C:5-1 and 2C:11-3.

Finally, the grand jury indicted Lesley, charging her with first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3, first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3, third-degree conspiracy to

commit financial facilitation, N.J.S.A. 2C:5-2 and 2C:21-25(e)(3); and third-degree financial facilitation, N.J.S.A. 21:25(e)(3).[2]

Morris was indicted and charged with fourth-degree tampering with physical evidence, second-degree conspiracy to commit aggravated arson, first-degree arson for hire, and second-degree conspiracy to commit desecration of human remains.

After a series of pretrial rulings, Morris entered a guilty plea to second-degree conspiracy to commit desecration of human remains in exchange for his truthful testimony against the Dorsetts. The court ordered severance of defendants, so that defendant, Kathleen, and Lesley would be tried individually on all of the charges in the indictments against them.

The State offered all three defendants plea agreements. Each plea offer was contingent on the guilty pleas of the other two defendants. The offers required defendant to plead guilty to the murder of his former son-in-law and the subsequent arson for hire and Kathleen to plead guilty to the murder of her former husband, the attempted murder of the victim's mother, and a conspiracy charge. The State would recommend significant terms of incarceration for both.

---

[2]  Lesley was also charged with one count of fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1), which the court dismissed.

In exchange, Lesley would plead guilty to conspiracy to commit murder and the State would recommend a relatively short term of imprisonment, giving her the chance to regain her freedom for a meaningful period after prison.

After Kathleen and Lesley's attempt to hire a hitman, defendant's counsel advised him that a passion/provocation defense, if successful, would not protect Kathleen and Lesley from exposure to significant prison terms. As counsel explained in his post-plea letter to defendant:

> [I]f the entire case was limited to [the victim's] death the situation would have been significantly different. However, as you know, after Katie[3] convinced Lesley to pay [the undercover officer] to eliminate [the victim's mother] the situation drastically changed. The defenses we had hoped to advance on your behalf which would have simultaneously exonerated Katie were no longer feasible. The conspiracy case against Lesley and Katie, considering the proofs and surrounding circumstances was very strong. Any leverage we had to negotiate a more favorable plea or to defend the original charges stemming from [the victim's] death were essentially eliminated. You did the right thing by your wife. She will get out and have a life.

On May 9, 2013, the three Dorsetts entered guilty pleas. Defendant pleaded guilty to first-degree murder and first-degree arson for hire. Kathleen pleaded guilty to first-degree murder, second-degree conspiracy to commit

---

[3] Defendant's counsel referred to Kathleen as Katie.

6

desecration of human remains, and first-degree attempted murder. Lesley

pleaded guilty to first-degree conspiracy to commit murder.

At his plea allocution, defendant told the court he was pleased with the

advice he received from his counsel, including advice regarding possible

defenses. In addition, defendant admitted to intentionally murdering his former

son-in-law in the following exchange with his counsel:

> [COUNSEL]: And Katie was again telling you concerns she had and which was causing you to be angry towards [the victim]; was it not?
>
> [DEFENDANT]: Yes.
>
> [COUNSEL]: And that anger was developing over time?
>
> [DEFENDANT]: Over time.
>
> [COUNSEL]: And increasing over time. Correct?
>
> [DEFENDANT]: Yes.
>
> [COUNSEL]: In fact . . . you were really growing a deep disdain or anger towards [the victim]; were you not?
>
> [DEFENDANT]: Yes.
>
> [COUNSEL]: And then in July of 2010 . . . you learned that somebody had filed and you believed it was [the victim] . . . a DYFS complaint against you. Right?
>
> [DEFENDANT]: Yes.

7

[COUNSEL]: And he alleged that you were engaging in improper conduct and contact with [your granddaughter]. Right?

[DEFENDANT]: Yes.

[COUNSEL]: That, in fact infuriated you, didn't it?

[DEFENDANT]: Yes.

[COUNSEL]: Humiliated you. And DYFS investigated. Is that right?

[DEFENDANT]: Yes.

[COUNSEL]: And you felt victimized?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: So that only heightened your anger and your disdain towards [the victim]; did it not?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: In fact, you wanted him out of your life and out of your family's life?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: And you considered ways of getting him out of your life, including planting drugs on him and reporting him to the police. Right?

[DEFENDANT]: Yes.

[COUNSEL]: And in fact even killing him?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: On August 16th, you were at Katie's in the morning. Right?

[DEFENDANT]: Yes.

[COUNSEL]: And that was one of [the victim's], if not his first overnight with [your granddaughter], it was early on after he was granted overnight visitation. Right?

[DEFENDANT]: Yes.

[COUNSEL]: And you really didn't want him to have that because you didn't think it was in the best interest of your granddaughter. Right?

[DEFENDANT]: Right.

[COUNSEL]: An on that day you were on the curb when [your granddaughter] was being dropped off. Right?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: And [the victim] went to the back area with you or where you were. Correct?

[DEFENDANT]: Yes.

9

[COUNSEL]: And that was under the guise of getting tools?

[DEFENDANT]: Yes.

[COUNSEL]: That were, that he supposedly had left at her house. Right?

[DEFENDANT]: Yes.

[COUNSEL]: And you instigated an argument with him; did you not?

[DEFENDANT]: Yes.

[COUNSEL]: And at one point during that argument you picked up an item off the ground, I think you said a cable, and you struck him in the head? Correct?

[DEFENDANT]: Yes.

[COUNSEL]: You did that, you knew what you were doing. Right?

[DEFENDANT]: Yes.

[COUNSEL]: Okay. You were angry, you were upset, you were somewhat irate, but you knew what you were doing. Correct?

[DEFENDANT]: Yes.

[COUNSEL]: And when you struck him in the head with the cable, why did you do it? What were you trying to do?

[DEFENDANT]: To kill him.

10

[COUNSEL]: And then when he fell, his head struck a four-by-four . . . . Right?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: And eventually as a result of either being struck in the head or striking his head when he fell, he did die. Correct?

[DEFENDANT]: Yes.

[COUNSEL]: There's no question in your mind that when you, despite your state of mind, being angry and this growing anger, when you picked up that cable and you struck him in the head with it, it was your purpose and your intention to kill him. Correct?

[DEFENDANT]: Yes.

. . . .

[COUNSEL]: I've explained to you, have I not, passion provocation/manslaughter, the difference between that, the elements of those and murder?

[DEFENDANT]: Yes.

[COUNSEL]: And do you understand that, and we've discussed, have we not, the possible defense of passion provocation to [the victim's] death?

[DEFENDANT]: Yes.

. . . .

11

[COUNSEL]: And are you satisfied with my advice?

[DEFENDANT]: Yes.

[COUNSEL]: Right? And you have – there's no question in your mind that you are guilty of the murder that you just described of [the victim] on that morning, August 16th?

[DEFENDANT]: Yes.

The factual basis Kathleen gave for her guilty plea underscored the intentional nature of defendant's murder of his former son-in-law:

> On August 16, 2010, [the victim] came to my residence . . . for a scheduled drop-off of our infant daughter. Approximately [thirty] minutes prior to [the victim's] arrival he texted me that he was on his way.
>
> When he arrived, I told [the victim] to get his tools in the backyard of the driveway. After [the victim] was convinced to retrieve his tools, I took my daughter into my house, knowing all the time my father was back there waiting to kill him.

The judge confirmed with Kathleen that she sent the victim into the backyard "knowing that [her] father was there waiting to kill him." And, when the judge asked her if "this [was] something [she] knew was going to happen, and it was [her] job to get him into the backyard," Kathleen responded, "[y]es."

The court sentenced the three Dorsetts on the same day. The court sentenced defendant to an aggregate forty-five years of imprisonment, with a

12

thirty-year period of parole ineligibility. Kathleen received an aggregate fifty-eight years of imprisonment with a forty-seven-year period of parole ineligibility. The court sentenced Lesley to a seven-year term of incarceration with an eighty-five-percent period of parole ineligibility.

Defendant and Kathleen filed appeals of their sentences, which were heard on our excessive sentence calendar. We affirmed both sentences. State v. Dorsett, No. A-3186-13 (June 4, 2014); State v. Dorsett, No. A-2224-13 (Apr. 7, 2014). Lesley maxed out of her sentence on December 16, 2016.

On September 22, 2015, Kathleen filed a PCR petition and an application to withdraw her guilty plea in the Law Division. She alleged that her attorney coerced her into pleading guilty by telling her that she would lose her daughter forever, that "a trial could put my mother in jail for the rest of her life" and that "a plea was the only possible route to save her mother." In support of her claim that she falsely admitted to conspiring with defendant to kill her former husband, Kathleen submitted a certification signed by defendant stating that on the day of the murder he and the victim were fighting when the victim "fell on a pile of metal junk" and "hit his head." Defendant's certification further stated that Kathleen was "not involved in the fight" and had no knowledge defendant was "going to injure or kill her ex-husband."

13

The trial court denied Kathleen's PCR petition and application to withdraw her guilty plea. We affirmed the trial court's decision. State v. Dorsett, No. A-0311-16 (June 7, 2018). The Supreme Court denied certification. State v. Dorsett, 236 N.J. 233 (2018).

On November 15, 2017, defendant filed a PCR petition and application to withdraw his guilty plea in the Law Division. He alleged his trial counsel was ineffective for not adequately advising him as to the passion/provocation defense and that his guilty plea was not knowingly and voluntarily made. Defendant argued that had he not received incorrect advice from his trial counsel, he would have pursued the passion/provocation defense instead of pleading guilty. He also argued that it would be a manifest injustice to deny his motion to withdraw his guilty plea because of the incorrect advice.

In his reply brief, defendant argued, for the first time, that trial counsel urged him to abandon a passion/provocation defense due to a "conflict of interest" because defendant could not pay his counsel's fee. According to defendant, his counsel was intent on pursuing a passion/provocation defense but suddenly changed his advice and told him the defense was not viable after his request to be released as counsel was denied to avoid expending time at trial for which he was unlikely to be paid. Defendant produced no evidence that a motion

14

to be released as counsel was made or a transcript of the court's decision if such a motion was made.

The State opposed defendant's petition, arguing that he failed to make a prima facie showing of ineffective assistance of counsel because his attorney advised defendant to follow a sound strategy to spare Lesley from a lengthy sentence. In addition, the State argued that defendant failed to establish grounds for withdrawal of his guilty plea.

On January 28, 2019, the trial court issued an oral opinion denying defendant's PCR petition without an evidentiary hearing, as well as his application to withdraw his guilty plea. With respect to the PCR petition, the court concluded defendant did not make a prima facie showing that his trial counsel's performance was ineffective. To the contrary, the court found trial counsel gave advice consistent with a valid trial strategy designed to prevent Lesley from receiving a lengthy prison sentence, noting that defendant's concern for his wife "permeates the entire trial" transcript. The court found defendant was not likely to have rejected a plea offer that allowed Lesley to avoid a long prison term even if counsel had advised him to mount a passion/provocation defense because Lesley would have to face trial, and likely conviction, if

defendant did not plead guilty. Thus, the court concluded that an evidentiary hearing was not warranted and defendant was not entitled to PCR.

With respect to defendant's application to withdraw his guilty plea, the court found that his claim of a colorable passion/provocation defense was not supported by the record. The court found that defendant's admission at his plea hearing that he instigated a confrontation with the victim after having him lured to the back of the garage to kill him stood in contradistinction to the elements of the defense. In addition, the court found defendant's claimed defense is contradicted by the admissions Kathleen made at her plea hearing that she and defendant conspired to murder the victim and that defendant was waiting to kill him behind the garage. The court also found no compelling reason to allow withdrawal of the plea and concluded the State would be at a significant disadvantage if defendant were permitted to do so because Lesley had already completed her lenient sentence, the benefit defendant sought by making a plea.

The court found that because defendant raised his trial counsel's alleged conflict of interest after the State filed its initial brief, the State did not have an adequate opportunity to address that claim. The court, therefore, did not address that claim without prejudice to defendant raising it at a later date. A January 28, 2019 order memorializes the trial court's decision.

This appeal followed.  Defendant makes the following arguments.

POINT I

THE TRIAL COURT (JUDGE 2) ERRED IN FINDING THAT TRIAL COUNSEL HAD NOT PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL.

POINT II

THE TRIAL COURT (JUDGE 2) ERRED IN CONCLUDING THAT THE DEFENDANT HAD NOT MADE A <u>PRIMA FACIE</u> SHOWING FOR AN EVIDENTIARY HEARING.

POINT III

THE TRIAL COURT (JUDGE 2) ERRONEOUSLY USED THE MORE ONEROUS STANDARD OF MANIFEST INJUSTICE INSTEAD OF THE LESSER STANDARD OF ABUSE OF DISCRETION IN DENYING THE APPLICATION BY THE DEFENDANT TO WITHDRAW HIS GUILTY PLEA. (Not Raised Below)

POINT IV

THE TRIAL COURT (JUDGE 2) ERRED BY NOT GRANTING THE REQUESTED STAY TO ALLOW THE DEFENDANT TO OBTAIN THE PRE-TRIAL TRANSCRIPT IN WHICH TRIAL COUNSEL HAD TO DEFEND AGAINST BEING REMOVED AS COUNSEL FOR THE DEFENDANT DUE TO A CONFLICT OF INTEREST RELATIVE TO LEGAL FEE ISSUES INVOLVING COUNSEL FOR THE CO-DEFENDANTS.

17

POINT V

THE TRIAL COURT (JUDGE 2) ERRONEOUSLY IGNORED THE ADMISSION BY THE PROSECUTION THAT THE DEFENDANT "HAD NOTHING TO DO WITH" THE CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER CHARGES LEVELED AGAINST TWO (2) CO-DEFENDANTS, FURTHER SUPPORTING INEFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL.

POINT VI

THE TRIAL COURT (JUDGE 2) ERRED IN FINDING THAT THERE WAS NO COLORABLE CLAIM OF INNOCENCE, SLATER FACTOR 1, TO ALLOW THE DEFENDANT TO WITHDRAW HIS GUILTY PLEAS.

## II.

Under Rule 3:22-2(a), a defendant is entitled to post-conviction relief if there was a "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey[.]" "A petitioner must establish the right to such relief by a preponderance of the credible evidence." State v. Preciose, 129 N.J. 451, 459 (1992). "To sustain that burden, specific facts" which "would provide the court with an adequate basis on which to rest its decision" must be articulated. State v. Mitchell, 126 N.J. 565, 579 (1992).

A-4507-18

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to the effective assistance of counsel. State v. O'Neil, 219 N.J. 598, 610 (2014) (citing Strickland v. Washington, 466 U.S. 668, 686 (1984); State v. Fritz, 105 N.J. 42, 58 (1987)). To succeed on a claim of ineffective assistance of counsel, the defendant must meet the two-part test established by Strickland and adopted by our Supreme Court in Fritz. 466 U.S. at 687; 105 N.J. at 58.

Under Strickland, a defendant first must show that his attorney made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. Counsel's performance is deficient if it "[falls] below an objective standard of reasonableness." Id. at 688.

A defendant also must show that counsel's "deficient performance prejudiced the defense[,]" id. at 687, because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" id. at 694; accord State v. Nunez-Valdez, 200 N.J. 129, 139 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. Strickland, 466 U.S. at 694.

19

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697; State v. Marshall, 148 N.J. 89, 261 (1997). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697. The right to the effective assistance of counsel extends to legal assistance related to the entry of a guilty plea. State v. Gaitan, 209 N.J. 339, 350-51 (2012).

We review a judge's decision to deny a PCR petition without an evidentiary hearing for abuse of discretion. State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013) (citing Marshall, 148 N.J. at 157-58). A hearing is required only when: (1) a defendant establishes a prima facie case in support of PCR; (2) the court determines that there are disputed issues of material fact that cannot be resolved by review of the existing record; and (3) the court determines that an evidentiary hearing is required to resolve the claims asserted. State v. Porter, 216 N.J. 343, 354 (2013) (citing R. 3:22-10(b)). "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" Id. at 355 (quoting R. 3:22-10(b)).

Having carefully reviewed the record in light of these legal principles, we affirm the January 28, 2019 order for the reasons stated in the trial court's oral opinion. We add the following brief comments.

As the trial court noted, defendant's argument conflates the alleged strength of his passion/provocation defense with the validity of the legal strategy to accept the State's plea offer to ensure that Lesley had a chance to spend time out of prison after serving her sentence. Initially, defendant's trial counsel advised him that he had a chance to establish a passion-provocation defense. If successful, this defense would shorten defendant's sentence and exonerate Kathleen of the murder of her ex-husband. The downside of pursuing the defense at that time was that if it was unsuccessful defendant would likely receive a longer sentence than might be offered by the State in plea negotiations.

However, once Kathleen and Lesley were charged with the attempted murder of the victim's mother, defendant's pursuit of the passion/provocation defense no longer had a potential benefit for either Kathleen or Lesley, who had been placed in jeopardy of a significant prison sentence because of their attempt to hire a hitman. If the defense was successful, defendant's sentence exposure would be diminished, but Kathleen would not be protected from the threat of a

lengthy sentence because she was charged with attempted murder of the victim's mother, as well as the murder of her former husband.

In addition, and perhaps more importantly, Lesley also faced a lengthy prison sentence on charges for which the incriminating evidence was substantial. The only way defendant could protect his wife from the threat of decades in prison was to plead guilty so she could accept the State's favorable offer to her, which was contingent on defendant's guilty plea. If he went to trial and pursued the passion/provocation defense Lesley would be forced to face trial on the serious charges she faced, regardless of the strength of defendant's defense. Given defendant's stated intent to protect his family, the trial court's conclusion that he would not have gone to trial whatever his counsel's advice might have been is supported by the record.

## III.

Withdrawal of a guilty plea after sentencing is warranted only "to correct a manifest injustice." R. 3:21-1. "[A] plea may only be set aside in the exercise of the court's discretion." State v. Slater, 198 N.J. 145, 156 (2009). The court considers four factors to determine if withdrawal of a guilty plea is warranted: "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a

22

plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused." Id. at 157-58. "No factor is mandatory; if one is missing, that does not automatically disqualify or dictate relief." Id. at 162.

"[T]he trial court's denial of defendant's request to withdraw his guilty plea will be reversed on appeal only if there was an abuse of discretion which renders the lower court's decision clearly erroneous." State v. Simon, 161 N.J. 416, 444 (1999); State v. O'Donnell, 435 N.J. Super. 351, 372 (App. Div. 2014).

There is ample support in the record for the trial court's denial of defendant's application to withdraw his guilty plea. Passion/provocation manslaughter has four elements: (1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled down before the slaying. State v. Carrero, 229 N.J. 118, 129 (2017). "The first two elements are assessed objectively, while the third and fourth are 'more subjective because they relate to the defendant's actual response.'" Ibid. (quoting State v. Robinson, 136 N.J. 475, 490 (1994)).

We agree with the trial court's conclusion that defendant did not establish that he had a colorable passion/provocation defense. When giving the factual basis for his plea, defendant admitted instigating a confrontation with the victim for whom he had a growing disdain. In addition, defendant admitted to having contemplated various methods of ridding himself of the victim, including killing him, and to having him lured to the back of the garage on the day of the murder so he could kill him. At sentencing, the court described the murder as "well thought-out and premeditated," which is incompatible with a passion/provocation defense. See State v. Chew, 179 N.J 186, 212 (2004) (holding that passion/provocation defense is undermined by evidence of premeditation).

The record also supports the trial court's conclusion that permitting defendant to withdraw his guilty plea after he gained the indirect benefit of Lesley's shorter sentence and release from prison would not be warranted. He and Lesley received the benefit of the plea bargain to which they both agreed. Additionally, it has been more than a decade since the murder, which likely has put the State at a disadvantage with respect to the availability of evidence were defendant's plea to be withdrawn. In particular, Morris, who has already been sentenced, would no longer have an incentive to cooperate in defendant's prosecution.

We have carefully considered defendant's remaining arguments, including his allegation of a conflict relating to his inability to pay his attorney's fees, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4507-18