**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1932-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILBERT DEMONSTHENE,
a/k/a WILBERT DEMOSTHENES,

    Defendant-Appellant.

_____

          Submitted December 3, 2025 – Decided March 6, 2026

          Before Judges Paganelli and Jacobs.

          On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 17-06-1320.

          Bahuriak Law Group, attorneys for appellant (Justin T. Loughry, of counsel; David S. Bahuriak, on the briefs).

          William E. Reynolds, Atlantic County Prosecutor, attorney for respondent (Matthew T. Mills, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Wilbert Demonsthene a/k/a Wilbert Demosthenes appeals from a January 21, 2025 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. Based on our careful review of the record and application of well-established law, we conclude defendant failed to establish prima facie claims regarding the State's purported failure to provide discovery or defense counsel's alleged ineffective assistance and affirm.

We glean the facts and procedural history from the record. In August 2016, defendant was a passenger in a vehicle traveling on the Atlantic City Expressway. He was in the vehicle with Anthony L. Hicks and Devan Leggette (co-defendants). Defendant "participated in shooting at another vehicle by discharging a weapon that was pointed at the other vehicle." Defendant was arrested in September 2016 for the incident.

In June 2017, an Atlantic County grand jury returned a seventeen-count indictment against defendant and his two co-defendants. The indictment charged: first-degree attempted murder, N.J.S.A. 2C:5-1(a)(1) and 2C:11-3(a)(1) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a) and 2C:11-3(a)(1)(2) (count two); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(l) (count three); second-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a) and 2C:12-1(b)(1) (count four); third-degree

aggravated assault, N.J.S.A. 2C:12-l(b)(2) (count five); third-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a) and 2C:12-l(b)(2) (count six); fourth-degree aggravated assault, N.J.S.A. 2C:12-l(b)(4) (count seven); second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a)(l) (count eight); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(l) (count nine); four counts of first-degree gang criminality, N.J.S.A. 2C:33-29(a) (counts ten, eleven, fourteen and fifteen); second-degree gang criminality, N.J.S.A. 2C:33-29(a) (count twelve); third-degree gang criminality, N.J.S.A. 2C:33-29(a) (count thirteen); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(l) (count seventeen). Each count of the indictment named all three, except count sixteen applied only to Hicks and count seventeen applied only to defendant.

On July 2, 2019, defendant entered a guilty plea. During the plea hearing, defendant's counsel explained the negotiated plea called for defendant to plead guilty to count one of the indictment, attempted murder, and for the State to seek a sentence of eighteen years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Counsel stated the "plea was contingent on the co-defendants . . . accepting and entering pleas of guilt[y] as well." Counsel represented she had reviewed the plea form with defendant.

A-1932-24

The transcript of the plea reveals the following colloquy:

THE COURT:  Are you satisfied with your counsel and the plea arrangement described to the [c]ourt?

THE DEFENDANT:  Negative.

. . . .

THE COURT:  Are you pleading guilty because you believe you are guilty?

THE DEFENDANT:  No.

THE COURT:  You don't believe you're guilty?

THE DEFENDANT:  I don't.  I'm pleading guilty because I don't have a shot at trial from what my mom says.[1]

THE COURT:  All right.  Well, let me . . . explain to you, sir, what happens here in New Jersey.  We don't have a plea situation where you can enter a plea for any other reason, primarily, that you believe that you're guilty of the offense.  You can also plead for other considerations, limiting your exposure, saving the people the trouble of a trial, making sure you know what the outcome is.  Those are all acceptable, but the first is that you have to admit factually those things which make you guilty of an attempted murder.

Now, with that explanation in mind, sir, are you pleading guilty because you believe you are guilty?

---

[1]  Defendant contends he stated "from what my attorney says."  The PCR court noted it was "difficult to make out exactly what . . . [defendant] stated when [it] listen[ed] on Courtsmart."

THE DEFENDANT:  Then yes.

THE COURT:  Are you pleading guilty voluntarily?

THE DEFENDANT:  Yes.

THE COURT:  Has anyone forced or threatened you to plead guilty or to enter into this agreement?

THE DEFENDANT:  No.

. . . .

THE COURT:  Sir, we talked about this plea form just a moment ago when we went over sentencing.  I see you have a copy there in front of you.  Did you review that document, together with the indictments, and the evidence in this case with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions for me or for [counsel] about any of those papers?

THE DEFENDANT:  No.

THE COURT:  Did you read and understand the plea forms before you signed them?

THE DEFENDANT:  Yes.

THE COURT:  Are these your initials and signatures I see?

THE DEFENDANT:  Yes.

THE COURT:  Did you answer all the questions truthfully?

5

THE DEFENDANT: Yes.

THE COURT: Have you pled guilty in court before?

THE DEFENDANT: Yes.

THE COURT: So, you understand the process we're going through?

THE DEFENDANT: Yes.

. . . .

THE COURT: All right. We're going to talk about the offense now, sir, and then I'll turn you over to [your counsel] if there's any additional questions that may be necessary. Now, it's alleged in [count one] that on August 29th, 2016[,] that you were in Egg Harbor Township; is that true?

THE DEFENDANT: Yes.

THE COURT: Where in the township were you when you committed this offense?

THE DEFENDANT: The [E]xpressway.

THE COURT: You were on the Atlantic City Expressway?

THE DEFENDANT: Yeah.

THE COURT: Were you driving a vehicle or were you a passenger in the vehicle?

THE DEFENDANT: The passenger.

6

THE COURT: And did you there and then attempt to cause the death of Yahshaun Stukes-Williams, Lenardo Caro and Shaun Stukes and/or a juvenile with the initials M.T.?

THE DEFENDANT: Can you repeat that?

THE COURT: Yes. The allegation is . . . that while you were in that car as a passenger --

THE DEFENDANT: Right.

THE COURT: -- you did something to attempt to cause the death of Stukes-Williams, Lenardo Caro, Shaun Stukes and/or a juvenile with the initials M.T.?

THE DEFENDANT: Yes, I was there.

THE COURT: All right. And by being there what steps did you take to carry out the attempt to cause the death of one or more of those persons?

THE DEFENDANT: Being there.

THE COURT: Okay. Well, being there is part of it.

THE DEFENDANT: Um-hum.

THE COURT: Also you have to aid and abet that attempted murder, and that means to assist or to solicit or to encourage others who are carrying it out. So, were you in possession of a weapon at the time?

THE DEFENDANT: Negative.

THE COURT: Was somebody else in the vehicle in possession of a weapon at the time?

7

A-1932-24

THE DEFENDANT:  I don't know.  I . . . only can say what I was there for.  I was in the car, [y]our [h]onor, and, you know, a lot of things just started happening, whatever, too much -- like I was just covering myself.  At the end of the day I got hit.  I was a victim of myself and I was just there.  So, that right there -- me knowing -- being there could give me 18 years.  I got to plead guilty instead of getting a life sentence.

THE COURT:  All right.  Well, I'm going to give you a moment to consult with your counsel, and understanding what the terms I've just described to you, you appear to have understood, in order to be guilty of an attempt to cause the death of another you have to act with the purpose to have that death carried out.  Now, I understand nobody died of those persons that were just mentioned, but you have to act with a purpose to have either yourself or others you're working with carry that out.  So, speak with [counsel] and then let me know what facts you believe make you guilty of this offense.

THE DEFENDANT:  Okay.

(Defendant confers with his attorney)

[COUNSEL]:  Thank you, [y]our [h]onor.

THE COURT:  All right. So, you've had a few moments to review the facts with [counsel]?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Now, what do you believe that you were doing, in concert with others, that makes you guilty of this offense?

THE DEFENDANT:  I participated in shooting at the car.

8

THE COURT:  You participated --

THE DEFENDANT:  In shooting at the vehicle.

THE COURT:  In shooting at the vehicle.

THE DEFENDANT:  Yes.

THE COURT:  All right.  And, so, you were discharging the weapon then?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And that was pointed at the vehicle that the other people were in; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  And under the circumstances you believe and agree and admit that your actions were with the purpose to carry out the deaths of those people that I've just listed for you; is that true?

THE DEFENDANT:  Yes.

. . . .

THE COURT:  Very well.  I find . . . defendant has had the advice of competent counsel to be satisfied he's entered his plea freely and voluntarily.  He's knowingly, intelligently, and freely waived his right against self-incrimination to a trial of the evidence by a jury of his peers and to be confronted by the witnesses against him.  He's not under any infirmity or intoxication.  He's not been threatened or coerced to enter a plea, not promised anything outside that document, which I incorporate.  He understands the range of [the] sentence to be

9

A-1932-24

imposed.  As a result[,] his plea has an adequate and a provident factual basis.  I accept it and find him guilty.

On August 15, 2019, defendant was sentenced to seventeen years, subject to NERA.  We affirmed the sentence on a sentencing oral argument calendar. See State v. Demonsthene, No. A-1457-19 (App. Div. Mar. 23, 2021).

In June 2024, defendant filed the petition for PCR.  In support of the petition, defendant certified that "[f]rom the moment" he met counsel, he "told her he wanted to fight the charges because he did not possess any weapon, he did not shoot anyone, and he did not take part in any plan or conspiracy." Further, he "asked [counsel] to interview specific witnesses, Kenneth Burrell, Ralph Rodriguez[,] and Steven Martinez, and get statements on his behalf because [he] wanted to go to trial."  However, counsel "never sent an investigator to speak with any of [his] witnesses."

In addition, defendant certified that he asked counsel "to file a motion for a severance from his co-defendant[s'] cases, but she failed to do so because she said the judge would not allow it."

In support of the petition, defendant provided a document that he asserted was a transcript of an exchange between Detective Glenn Garrels and Idalis Euceda, Leggette's girlfriend.  According to the document, the detective advised Euceda that he was "looking into an incident that happened last year on the

Atlantic City Expressway." He stated the occupants of the car in which the victim was the passenger were "trying to put the whole case" on defendant and his co-defendants. However, he thought that was "bulls[**]t," and he knew their claim of "self-defense" was "wrong." The detective advised he had their "text messages going back and forth where they [we]re admitting to getting guns and stuff like that." The detective advised he wanted to verify Leggette's phone number to get "his records and prove" defendant and the co-defendants "weren't trying to set things up."

In further support of defendant's PCR petition, he hired a private investigator "to track down and interview witnesses, and if possible, obtain written statements." Defendant proffered an undated report from the private investigator detailing her meeting with Rodriguez. According to the report, the investigator met with Rodriguez on April 23, 2022. Rodriguez advised that he had met with a New Jersey State Trooper in the summer of 2018. The trooper advised Rodriguez that he had been "identified through DNA on a Gatorade bottle found in the white SUV at the crime scene." (Capitalization modified). Rodriguez suggested "that someone must have been recycling bottles because . . . although he knew the occupants in the white SUV . . . [he] had not been in the white SUV" and learned about the shooting on Facebook. (Capitalization

11

modified).  Rodriguez was familiar with a black pick-up truck, having seen it "around town" and knew defendant "by face to say hello."  The trooper advised that he would "run Rodriguez['s] cell number to the pin of the local cell tower in the area of the . . . crime scene."  "Rodriguez never heard from the . . . [t]rooper again."  Rodriguez's and the investigator's signatures were witnessed on the investigator's report by the investigator.

Also, defendant submitted a November 2, 2022 report from the private investigator's meeting with Burrell.  According to the report, in 2016, Burrell "was questioned regarding his fingerprints located in a van involved in a drive by shooting which resulted in the Atlantic City Expressway homicide."  While he was "being questioned . . . a Hispanic male was also brought in[] . . . and . . . questioned about the same Atlantic City Expressway homicide."  Burrell advised the unidentified police detective "the van in question was used by . . . community residents for erran[d]s," it was "a community van" and when someone needed it, they paid the owner for "usage."

Burrell explained that the unidentified detective kept referring to him as defendant.  Burrell advised the detective "that although both he . . . and [defendant] . . . had dread locks, . . . he . . . was not" defendant.  Burrell denied knowing anything about the Atlantic City Expressway shooting.

12

Further, Burrell claimed "he was given a written statement from the unidentified police detective, that he . . . was cleared of any involvement in the Atlantic City Expressway homicide." Burrell also claimed the statement was placed in defendant's and the co-defendants' discovery file; however, the investigator found no mention of Burrell's name or the statement in defendant's discovery file.

Moreover, Burrell advised the investigator that when he and defendant were incarcerated, Burrell had told defendant about the detective's questioning. Further, he stated he was willing to give a statement to defendant's counsel, before defendant was sentenced, but no one "ever c[a]me to interview him." Indeed, Burrell indicated "that until this interview [with the investigator] . . . no one from [defendant's] legal team [had] ever c[o]me to" interview him.

Burrell signed the report stating: "I . . . certify that the above statement is true and accurate to the best of my knowledge." In addition, on November 17, 2022, Burrell signed an affidavit affirming the information in the investigator's report and stated: "I swear/affirm the foregoing statements are true and correct to the best of my knowledge, information[,] and beliefs. I know a willfully false statement will subject me to punishment." Burrell's was the only signature on the affidavit.

Further, defendant submitted a March 8, 2023 report from the investigator detailing a March 8 meeting with Martinez. According to the report, Martinez stated that when he and defendant were incarcerated together, he had "related important information which could possibly exonerate" defendant. Martinez "agreed to give [defendant's counsel] . . . a signed statement regarding [defendant's] police investigation regarding the 2016 Atlantic City Expressway homicide." While the two were incarcerated, defendant "on numerous occasions . . . asked . . . Martinez if his [counsel] or anyone from her staff had come to interview [him] regarding [his] statement on behalf of" defendant. On each occasion, "Martinez responded 'NO[.]'" Martinez signed the report: "I . . . swear that the above statement is true and accurate to the best of my knowledge."

In addition, Martinez signed two affidavits. In one affidavit, Martinez stated, he was "visited in August 2016 by a [d]etective from the New Jersey State Police, who was conducting a shooting investigation." Martinez described that the detective was accompanied by a parole agent. The parole agent searched Martinez's residence while he was questioned by the detective. The detective was aware that Martinez "had been recuperating from multiple gunshot wounds in [his] legs." "The [d]etective accused [Martinez] of being involved in the Expressway shooting, as retaliation to what happened to" him and stated "that

14

the pickup truck involved in the Expressway shooting was seen parked in front of [his] residence the day before the shooting." Martinez advised the detective that he "had been on [b]racelet [m]onitoring a week or so [as] of the Expressway shooting, and . . . the pickup truck was a 'street rental.'" Martinez advised the detective that he knew defendant from Facebook. The detective "threatened [Martinez] that if [his] telephone number came up in [defendant]'s phone, he would be back to speak to" him, however, "[t]he [d]etective never returned." Martinez signed the affidavit: "I swear/affirm the foregoing statements are true and correct to the best of my knowledge, information[,] and beliefs. I know a willfully false statement will subject me to punishment." Martinez's was the only signature on the affidavit.

In another affidavit, Martinez stated that in 2016, he and defendant were incarcerated together and Martinez "relayed important information that [he] believed would help [defendant] be exonerated." Martinez stated he was willing to give a statement to defendant's counsel. Moreover, "[o]n numerous occasions, [defendant] asked [him] if [counsel] or anyone from his legal team had come to interview [him], which [he] answered NO." The affidavit was signed by both Martinez and the investigator.

A-1932-24

Lastly, defendant proffered a 2021 New Jersey State Police Annual Major Discharge Reporting Form that stated, in part, Lieutenant[2] Garrels had been suspended for thirty days because he

> admitted to acting in an official capacity to the discredit of the Division while on-duty. [Garrels] improperly utilized the New Jersey Criminal Justice Information System and violated the State of New Jersey Anti-Discrimination Policy by creating a newsletter which contained inappropriate language concerning other members of the Division.

Defendant alleged the State failed to: "turn over all text messages and phone records"; "turn over witness and/or suspect statements"; and "disclose Detective . . . Garrels['s] disciplinary history and/or ongoing investigations into Detective . . . Garrels['s] egregious discriminatory behavior while on-duty."

Further, he contended he was denied his constitutional right to effective assistance of counsel because his counsel: failed "to seek a severance from co-defendants"; failed "to conduct any investigation or prepare and provide any defense"; coerced "defendant into accepting the plea agreement"; and had divided "loyalties . . . causing conflicting interests." Defendant asserted that he had no confidence in his counsel and had pleaded guilty out of "fear of being

---

[2] Garrels is referenced as both a lieutenant and a detective in the record.

A-1932-24

sentenced to life imprisonment" and was "pressured" by counsel to accept "the plea agreement because the plea agreement was all-or-none."

Defendant did not state that he would have refused to plead guilty based on the investigation reports and statements of Rodriguez, Burrell, and Martinez. He also did not claim that Detective Garrels's interview of Euceda or Detective Garrels's disciplinary history would have changed his decision to plead guilty.

The PCR court heard the parties' arguments on December 11, 2024. On January 21, 2025, the court issued a twenty-three-page written decision accompanying its order denying defendant's petition.

In considering the argument that defense counsel had been ineffective by refusing to interview any witnesses, the court found "defendant d[id] not provide an explanation to [it] as to how these witnesses or their statements would have been beneficial to [him] around the time he took his plea." Instead, the court found "statements made by alleged witnesses . . . [we]re more closely related to bald assertions than sworn affidavits or certifications."

Nevertheless, the court found "counsel [was] arguably deficient i[n] the failure to interview these witnesses prior to [defendant] pleading guilty." Moreover, the court observed that "[i]t c[ould] not be said whether more, potentially exculpatory information, would have been offered by these witnesses

A-1932-24

when their memories were more easily recalled." However, the court found defendant had "not produced any evidence of same."

As to his plea, the PCR court noted defendant "said he was not satisfied with his counsel and the plea arrangement." The court "listened to the audio" of the plea, and noted defendant's mother, not trial counsel, "told him he didn't have a shot a trial." Nevertheless, the court found "whether his attorney or his mom told him . . . [wa]s not dispositive." Instead, "defendant gave a factual basis and his plea was accepted by the [c]ourt." The court noted defendant "stated that he was pleading guilty voluntarily and that no one forced or threatened him to plead guilty or enter into the agreement."

The PCR court found "[f]rom what [defendant] stated during the plea, there [we]re no facts to suggest that counsel was ineffective or coerced [him] into entering the plea." Instead, defendant: "ultimately took his exposure into consideration and made a voluntary admission of guilt"; "acknowledged that he was pleading guilty because he believed he was guilty"; "plead[ed] guilty voluntarily and without force or threat to do so"; was advised of "his exposure and recommended sentence before he pled"; and understood the terms of the plea.

18

The PCR court considered defendant's arguments "that the State withheld evidence and statements of suspects and/or witnesses whose DNA was found inside the black Dodge pick-up truck." In addition, the court considered defendant's assertions "that text messages and phone records were withheld, potential material concerning [a detective] could have been withheld and [an] actual police statement . . . that may have contained exculpatory information was withheld."

The PCR court found "there [wa]s nothing to suggest that there were text messages or phone recordings" aside from an interview conducted by a detective. The court concluded the detective had "utilize[d] appropriate investigative tactics to obtain additional information from [a] witness," and there was no evidence the detective actually showed the witness "text messages or play[ed] . . . phone records or indicate[d] anything other than the fact that they exist[ed]." The court found defendant's "bare assertion . . . suggest[ing] that these text messages and phone records exist [wa]s insufficient to show the State was withholding material information."

In addition, the PCR court considered defendant's assertions concerning "unconfirmed material" regarding Detective Garrels's and Rodriguez's statements. However, the court found the "material [wa]s at most, speculative."

19

Indeed, "[t]here [wa]s nothing in the record to suggest that the State was withholding information regarding" Detective Garrels nor how the detective's disciplinary record, "two years after [defendant] pled guilty," was "pertinent to this case."

Moreover, the PCR court found "there [wa]s nothing to indicate or suggest that Rodriguez's statement to police would have included exculpatory information" and "[t]he argument that there may have been exculpatory information withheld [wa]s not enough." The PCR court found defendant could not "point to any specific evidence that was withheld, let alone demonstrate that it was material to either guilt or punishment."

Further, the PCR court considered whether trial counsel's failure to interview the witnesses prejudiced defendant's case. In this respect, the court found "it [wa]s unclear as to how the statements made would have impacted [defendant]'s decision to plead guilty." The court noted the statements were "made years later" and "it [wa]s unclear as to how the . . . statements . . . would have changed the outcome of the case, exonerated [defendant], or even been impactful in his decision to enter a guilty plea."

Moreover, the court found "counsel's performance was in no way tantamount to a complete denial of representation." Also, the court stated "[i]t

20

[wa]s not entirely clear . . . what [defendant] was seeking to prove through the . . . witnesses." Therefore, "[e]ven in viewing this deficiency in a light most favorable to [defendant], it d[id] not rise to the level of prejudice."

Thus, the PCR court concluded, "[t]he allegations submitted by [defendant] do not require the [c]ourt to grant a hearing as [defendant] ha[d] not presented a prima facie case of ineffective assistance of counsel."

On appeal, defendant presents the following arguments:

> I. THE PETITION PRESENTS A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL.
>
>> A. THE STANDARD FOR A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL ARISES FROM FEDERAL AND STATE PRECEDENT.
>>
>> B. [DEFENDANT] MADE OUT A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL, SUFFICIENT TO WARRANT AN EVIDENTIARY HEARING.
>
> II. T[HE] MOTION JUDGE ABUSED HER DISCRETION IN DENYING AN EVIDENTIARY HEARING.
>
> III. THE PETITION PRESENTED A COGNIZABLE CLAIM OF VIOLATION OF BRADY V. MARYLAND; THE STATE FAILED IN SEVERAL INSTANCES TO HONOR ITS DUE PROCESS OBLIGATIONS UNDER APPLICABLE

21

PRECEDENT AND CONSTITUTIONAL REQUIREMENTS.[3]

IV. COUNSEL'S DEFICIENT PERFORMANCE, CERTAIN BRADY VIOLATIONS, AND AN ALL OR NOTHING "COLLECTIVE" CONTINGENCY IN THE OFFERED PLEA, CONVERGED IN THE PLEA HEARING TO RENDER [DEFENDANT]'S PLEA LESS THAN KNOWING, INTELLIGENT AND VOLUNTARY.

Defendant contends the State committed Brady violations by failing to produce the text messages, alluded to by Detective Garrels during his interview of Euceda, and information regarding Detective Garrels's 2021 thirty-day disciplinary suspension. He also contends counsel's representation was ineffective because she failed to "contact and interview potential witnesses whom defendant identified"; "follow-up" on the text messages; "file a motion for severance"; and "insisted . . . that going to trial would be futile." Defendant argues he established a prima facie right to PCR and the PCR court abused its discretion by not holding an evidentiary hearing.

When "the PCR court has not conducted an evidentiary hearing, we review its legal and factual determinations do novo." State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020). PCR "is New Jersey's analogue to the federal

---

3 Brady v. Maryland, 373 U.S. 83 (1963).

writ of habeas corpus."  State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)).  It "provide[s] a built-in 'safeguard that ensures that a defendant [i]s not unjustly convicted.'"  State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).

"A petition for [PCR] is cognizable if based upon . . . [a s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey."  R. 3:22-2(a).

In Brady, "the United States Supreme Court held that due process forbids the government from withholding material evidence favorable to an accused."  State v. Hernandez, 225 N.J. 451, 466 n.5 (2016).  "In order to establish a Brady violation, the defendant must show that:  (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material."  State v. Martini, 160 N.J. 248, 268 (1999).

Our Court has noted "[t]he disclosures required by Rule 3:13-3(b)(1), which include the release of exculpatory information or material and all other information relevant to a legitimate defense, are more expansive than the due process disclosures mandated by Brady and its progeny."  Hernandez, 225 N.J. at 466 n.5.  "[T]he Rule has been described as establishing an 'open file'

23

discovery system whereby virtually all records and information in the prosecutor's possession must be disclosed, subject to the prosecutor's authority to apply for a protective order." State v. Allen, 482 N.J. Super. 142, 151 n.2 (App. Div. 2025) (citing Hernandez, 225 N.J. at 453).

In addition to the right to discovery, "[t]hose accused in criminal proceedings are guaranteed the right to counsel to assist in their defense." State v. Gideon, 244 N.J. 538, 549 (2021) (citing U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). "[I]t is not enough '[t]hat a person who happens to be a lawyer is present at trial alongside the accused,' rather, the right to counsel has been interpreted by the United States Supreme Court and [the New Jersey Supreme] Court as 'the right to the effective assistance of counsel.'" Id. at 550 (second alteration in original) (citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 685-86 (1984)).

To establish a prima facie claim for ineffective assistance of counsel, a defendant must satisfy the two-prong test established in Strickland. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed the defendant by the Sixth Amendment."[4]  Strickland, 466 U.S. at 687.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

"Moreover, when a defendant asserts their attorney was ineffective by failing to file a specific motion, they must establish that the motion would have been successful."  State v. Balbosa, 481 N.J. Super. 497, 520 (App. Div. 2025) (citing State v. O'Neal, 190 N.J. 601, 619 (2007)).  Indeed, "[i]t is not ineffective assistance of counsel for defense counsel not to file a meritless motion[.]"  Ibid. (quoting O'Neal, 190 N.J. at 619).

---

[4]  The Sixth Amendment to Constitution of the United States provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

A-1932-24

A defendant "must do more than make bald assertions that he was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Therefore, when a defendant "claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." Ibid. See also R. 1:6-6 ("If a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify . . . ."); R. 1:4-4(b) ("In lieu of the affidavit, oath or verification required by these rules, the affiant may submit [a] certification, which shall be dated and immediately precede the affiant's signature." The affiant must "certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wil[l]fully false, I am subject to punishment.").

Under "the 'second, and far more difficult, prong of'" Strickland, a defendant must show that his or her defense was prejudiced. Gideon, 244 N.J. at 550 (quoting Preciose, 129 N.J. at 463). The defendant must demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial,

a trial whose result is reliable." Strickland, 466 U.S. at 687. "Prejudice is not to be presumed." Gideon, 244 N.J. at 551 (citing State v. Fritz, 105 N.J. 42, 52 (1987)). "The defendant must 'affirmatively prove prejudice.'" Ibid. (quoting Strickland, 466 U.S. at 693).

In the context of a guilty plea, a defendant must establish "that there [wa]s a reasonable probability that, but for counsel's errors, [he or she] would not have pled guilty and would have insisted on going to trial." State v. Gaitan, 209 N.J. 339, 351 (2012) (second alteration in original) (internal quotation marks omitted) (quoting State v. Nuñez-Valdéz, 200 N.J. 129, 139 (2009)). A defendant must convince the court that a "decision to reject [a] plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010).

When a guilty plea is contested, counsel's performance is not deficient if "a defendant considering whether or not to plead guilty to an offense receives correct information concerning all of the relevant material consequences that flow from such a plea." State v. Agathis, 424 N.J. Super. 16, 22 (App. Div. 2012) (citing Nuñez-Valdéz, 200 N.J. at 138).

If defendant fails to "make[] both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

A defendant "must establish the right to [PCR] by a preponderance of the credible evidence." Preciose, 129 N.J. at 459 (citing State v. Mitchell, 126 N.J. 565, 579 (1992)). "R[ule] 3:22-1 does not require evidentiary hearings to be held on [PCR] petitions [and] R[ule] 3:22-10 recognizes judicial discretion to conduct such hearings." Cummings, 321 N.J. Super. at 170. An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. and Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1986)).

Nevertheless, PCR "courts ordinarily should grant evidentiary hearings to resolve ineffective-assistance-of-counsel claims if a defendant has presented a prima facie claim in support of" PCR. Preciose, 129 N.J. at 462. "[C]ourts should view the facts in the light most favorable to a defendant to determine whether a defendant has established a prima facie claim." Id. at 462-63. "A prima facie case is established when a defendant demonstrates 'a reasonable

A-1932-24

likelihood that his or her claim . . . will ultimately succeed on the merits.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting R. 3:22-10(b)).

Applying this well-established law, we consider defendant's arguments. First, we conclude defendant failed to make a prima facie showing of Brady or Rule 3:13-3 violations. Defendant contends he was not provided with discovery in the form of text messages alluded to by Detective Garrels during his interview of Euceda. We note the State's position that "it is unclear where the quasi-transcription came from." Moreover, the State contends "presum[ably] . . . [d]efendant was aware of it prior to" pleading guilty or filing his sentencing appeal, and thus the claim is barred. See R. 3:22-4(a) ("Any ground for relief not raised in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the adoption of this rule, or in any appeal taken in any such proceedings is barred."). Nevertheless, we conclude defendant's claim fails because there is no evidence that the text messages ever existed.

Moreover, defendant's claim that information about Detective Garrels's 2021 disciplinary suspension should have been disclosed is without merit, given that the shooting occurred in 2016, defendant pleaded guilty in 2019, and the detective was not disciplined until 2021. Under these circumstances, defendant

cannot establish that the State suppressed evidence; that the evidence would have been favorable to his defense; or that the evidence was material. See Martini, 160 N.J. at 268.

Second, we conclude there is no merit to defendant's argument that he made a prima facie showing of ineffective assistance of counsel under Strickland.

Defendant acknowledges "[t]he non-sworn status[,] or other formal flaws[,] of the Martinez, Burrell[,] and Rodriguez interviews/affidavits." However, he asserts they "signed their affidavit or the investigator's summary" and thus presented "cognizable evidence" that could have been cured through a "subpoena[] to appear," despite any format deficiency. This argument misses the mark and holding in Cummings. See 321 N.J. Super. at 170 (Claims must be "supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification."). Indeed, there is no appearance or evidentiary hearing without a prima facie claim that is established through properly executed affidavits and certifications.

Notwithstanding these deficiencies and giving defendant every inference that counsel should have interviewed his suggested witnesses, defendant fails to establish prejudice, the "far more difficult prong." Gideon, 244 N.J. at 550

(quoting Preciose, 129 N.J. at 463). The import of the statements from defendant's witnesses merely establishes a police investigation and their consideration of others as possible suspects. Even Martinez's "important information" that could have "exonerated" defendant is not revealed in Martinez's statement or by defendant in his petition. Under these circumstances, defendant cannot satisfy the second Strickland prong and fails to establish a prima facie claim of ineffective assistance of counsel.

Defendant's ineffective assistance of counsel claim regarding counsel's failure to "follow-up" on the text messages is likewise without merit. As we stated, there was no evidence the text messages existed.

Additionally, defendant's argument that counsel failed to move for severance is without merit. Defendant was scheduled to proceed to a joint trial with his co-defendants, and he argues counsel should have moved for severance to secure a separate trial. He states "[c]o-defendants cannot be tried together fairly if their defenses are antagonistic and mutually exclusive or irreconcilable." Defendant claims he "could rationally foresee a joint trial . . . resulting in a rejection of his defense that he was a victim, not an assailant." However, nothing in the record suggests that severance was warranted. See State v. Brown, 118 N.J. 595, 605-06 (1990) ("The test for granting severance,

31

however, is a rigorous one. Separate trials are required only when defendants 'present defenses that are antagonistic at their core.' <u>United States v. Berkowitz</u>, 662 F.2d 1127, 1134 (5th Cir. 1981). The mere existence of hostility, conflict, or antagonism between defendants is not enough."). Nor does defendant overcome the presumption that counsel did not "exercise . . . reasonable professional judgment" in her decision. <u>See</u> <u>Strickland</u>, 466 U.S. at 690. Further, defendant's severance argument amounts only to a "bald assertion." <u>See</u> <u>Cummings</u>, 321 N.J. Super. at 170 (noting petitioner must do more than make bald assertions to establish ineffective assistance of counsel).

Further, defendant's claim that he was provided with ineffective assistance regarding counsel's insistence on proceeding to trial is belied by the plea hearing. The plea court found defendant pleaded "freely," "voluntarily," "knowingly," "intelligently," and without threat or coercion. The transcript of the plea hearing does not support defendant's bald assertion counsel insisted on defendant's plea. Further, defendant does not assert that it would have been reasonable for him to forego the plea deal. Indeed, defendant would have been confronted with a multi-count indictment at trial.

Because we are satisfied defendant failed to establish a prima facie claim of <u>Brady</u> or <u>Rule</u> 3:13-3 violations, or ineffective assistance of counsel under

Strickland, we conclude the PCR court did not abuse its discretion in denying his request for an evidentiary hearing.

To the extent we have not addressed defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1932-24